UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
JOSHUA RAMUS,                                       :    23-cv-1770
                                                    :
                            Plaintiff,              :    **COMPLAINT**
                                                    :
              - against -                           :
                                                    :
GRAHAM R. BRUWER and GERARD E.                      :
METOYER,                                            :
                                                    :
                            Defendants.             :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff, JOSHUA RAMUS, as and for his Complaint, respectfully alleges as follows:

## PARTIES

1.      Plaintiff, JOSHUA RAMUS ("Plaintiff"), is an individual temporarily residing at

53 Park Place, Unit 9I, New York, New York.

2.      Upon information and belief, Defendant GRAHAM R. BRUWER ("Defendant

Bruwer"), is an individual residing at 151 Cumberland Road, Glendale, California.

3.      Upon information and belief, Defendant GERARD E. METOYER A/K/A

GERRY METOYER A/K/A ELDRIDGE G. METOYER ("Defendant Metoyer" and, together

with Defendant Bruwer, the "Defendants"), is an individual residing at 6003 Monroe Place, Apt.

5D, West New York, New Jersey.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because

the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is

between citizens of different states.

5.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the

events or omissions giving rise to the claims occurred in this district.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

**The Agreement**

6.     Bulson Management, LLC ("Bulson") is a New York limited liability company,

which is part of a bi-coastal construction business, doing business as "Bulson Building

Contractors," with offices in New York City and Los Angeles.

7.     On its business website, Bulson holds out its services as:

5-STAR CUSTOM     REMODELING DELIVERED     ON-SCHEDULE
AND UNDER-BUDGET

If you need a high-end contractor to partner with you on your residential
or commercial construction project, Bulson is here to help. We serve elite
clientele from coast-to-coast with bespoke remodeling that is the perfect
match for your vision. Our team is deeply experienced bringing
architectural plans and client dreams to life.

https://www.bulsonbuildingcontractors.com

8.     Plaintiff is the sole owner of the shares allocated to the cooperative apartment

known as 100 Hudson Street, Apt. 2E, New York, New York (the "Premises").

9.     On or about August 6, 2020, Plaintiff and Bulson entered into an American

Institute of Architects Document A105 – 2017, Standard Short Form of Agreement Between

Owner and Contractor (the "Agreement"), pursuant to which Bulson would serve as the general

contractor for the complete renovation (the "Project") of the Premises. A copy of the Agreement

is annexed hereto as Exhibit A.[1]

---

[1] Section 16.4 and Article 17 of the Agreement provide that any dispute between Plaintiff and
Bulson must be mediated and then arbitrated before the American Arbitration Association.
Plaintiff is commencing such proceedings. For that reason, Bulson is not included in this action
as a defendant.

10.     Upon information and belief, Defendant Bruwer is the founder and sole member of Bulson.

11.     Defendant Bruwer executed the Agreement on behalf of Bulson as its Chief Executive Officer.

12.     Defendant Metoyer is the Comptroller of Bulson. See the Partial Lien Waiver, signed by Defendant Metoyer as Comptroller, annexed hereto as Exhibit B.

13.     Prior to the commencement of and to accommodate the Project, Plaintiff rented an apartment to reside in temporarily. In addition to the rent, Plaintiff also pays insurance for this rented apartment.

14.     To further accommodate the Project, Plaintiff is also paying for storage of his personal belongings. In addition to the storage fees, Plaintiff also pays insurance to insure his belongings.

15.     The Project was scheduled to commence on August 17, 2020. Exhibit A, § 2.2.

16.     Ultimately, the Project commenced on or about October 20, 2020, upon receipt of the approval from 100 Hudson Tenants Corp., the corporation that owns the building where the Premises is situated (the "Corporation").

17.     The Agreement provided that the Project would be substantially completed in 38 weeks, i.e. on or about July 13, 2021. Exhibit A, § 2.2.

18.     The Agreement provides that all deadlines therein were of the essence. Exhibit A, § 11.1.

19.     The Agreement provided that the total cost of the Project would be $1,275,811.00. Exhibit A, § 3.1.

20.    Subsequently, the total cost of the Project was revised, pursuant to change orders, to $1,388,078.00.

21.    Pursuant to the Agreement, Bulson had full control over, and contractual relationships with, the subcontractors retained for the Project. Exhibit A, § 2.2.

22.    The Agreement provides that costs attributable to delays caused by improperly timed activities or defective construction shall be borne by the responsible party. Exhibit A, § 11.3.

23.    The Agreement also states that Bulson had to promptly pay each subcontractor and supplier upon receipt of payments from Plaintiff. Exhibit A, § 12.4.2.

24.    The Agreement also acknowledged receipt by Bulson of an Alteration Agreement between Plaintiff and the Corporation, with which Bulson agreed to comply and to indemnify Plaintiff from Bulson's non-compliance. Exhibit A, § 18.2.

25.    Pursuant to the Alteration Agreement, if the project was not completed on or before July 21, 2021, there would be a late charge imposed on Plaintiff by the Corporation in the amount of $400.00 per working day.

26.    Pursuant to the Alteration Agreement, Plaintiff must pay $500.00 per month to the Corporation as an alteration fee, for as long as the Project is ongoing.

27.    Pursuant to the Alteration Agreement, Plaintiff also paid a security deposit of $37,142.76, which will not be released (or applied to cover fees due under the Alteration Agreement) until the Project is complete.

**The Subcontractors**

28.    Upon information and belief, on or about November 10, 2020, Bulson entered into a subcontract with Renovation Partners Incorporated ("RPI") to manufacture and install doors at the Premises for $50,400.00.

29.    Upon information and belief, on or about March 8, 2021, Bulson entered into another subcontract with RPI to manufacture and install certain millwork at the Premises for $110,620.00.

30.    Upon information and belief, on or about April 19, 2021, Bulson entered into a subcontract with Allogio, Inc., RPI's affiliate (RPI and Allogio, Inc., collectively "Millwork Subcontractor") to manufacture windows to be installed at the Premises for $59,500.00.

31.    Upon information and belief, on or about March 8, 2021, Bulson entered into a Subcontract with HVAC Performance LLC ("HVAC Subcontractor") to install heating and cooling equipment at the Premises, for $53,405.07, which price was subsequently increased by $3,858.31 pursuant to three change orders.

32.    Upon information and belief, Bulson entered into a subcontract with Sunny Electrical Contracting, Inc. ("Electrical Subcontractor") to perform electrical work at the Premises for $32,500.00, which price was subsequently increased by $11,750.00 pursuant to two change orders.

33.    Upon information and belief, Bulson entered into an oral subcontract with Digifabshop ("Window Hardware Subcontractor") to fabricate certain window hardware for $52,220.00, which price was subsequently increased to $12,590.00 pursuant to change orders.

34.    Upon information and belief, Bulson entered into a subcontract with Macreddin Plumbing & Heating ("Plumbing Subcontractor") to perform plumbing work at the Premises for

$28,850.00, which price was subsequently increased by $15,650.00 pursuant to six change orders.

35.     Upon information and belief, Bulson entered into a subcontract with Heritage Custom Flooring ("Flooring Subcontractor") to install, sand, and finish wood floors at the Premises for $12,418.00.

36.     Upon information and belief, Bulson obtained a quote and a draft of a subcontract from Glass & Mirror LLC ("Glass & Mirror") to fabricate and install certain glass and mirror items on the Premises, but did not enter into a subcontract with Glass & Mirror.

**Payments for the Project**

37.     During the Project, Bulson would issue Plaintiff invoices, and subsequently applications and certificates for payments, which itemized the payments to be paid to Bulson and the subcontractors for labor and materials.

38.     Upon receipt of such invoices and applications for payments by Bulson, which purported to represent amounts due or already paid to subcontractors, Plaintiff promptly made payments to Bulson as follows:

     a.     On November 26, 2019, Plaintiff paid $19,159.50;

     b.     On January 2, 2020, Plaintiff paid $19,159.50;

     c.     On February 28, 2020, Plaintiff paid $10,410.60;

     d.     On October 14, 2020, Plaintiff paid $334,013.70;

     e.     On February 25, 2021, Plaintiff paid $123,181.87;

     f.     On September 8, 2021, Plaintiff paid $174,542.47;

     g.     On November 9, 2021, Plaintiff paid $82,611.05;

     h.     On December 23, 2021, Plaintiff paid $35,477.42;

      i.      On February 7, 2022, Plaintiff paid $65,134.87;

      j.      On March 28, 2022, Plaintiff paid $27,300.00;

      k.      On April 18, 2022, Plaintiff paid $40,342.00; and

      l.      On June 22, 2022, Plaintiff paid $40,870.00.

39.      In total, Plaintiff paid Bulson $972,202.97.

40.      Pursuant to Article 3-A of the New York Lien Law, all the payments made to Bulson constituted assets of a trust of which Plaintiff is a beneficiary.

**Project Delays and Defendants' Prevarications**

41.      Despite Plaintiff's timely payments, Bulson did not complete the Project within the time set forth in the Agreement.

42.      As of February 2023, one year and seven months after the Project was to be completed pursuant to the Agreement, the majority of the work on the Project was not done.

43.      Even though Bulson completed only well under half of the Project, Defendants represented, in AIA Document #G702 – 1992 - Application and Certificate for Payment No. 8 ("AFP No. 8"), that work had been completed and materials purchased and stored in the amount of $1,080,225.53, or 78% of the entire budget. A copy of AFP No. 8 is annexed hereto as Exhibit C.

44.      Per the Agreement, Plaintiff paid 90% of this amount ($972,202.97) to Bulson, while Plaintiff held 10% of this amount ($108,022.55) as "retainage" which would be paid to Bulson after the Project was fully completed. Exhibit A, § 4.1.

45.      Defendant Bruwer blamed the slow progress of the Project on the COVID-19 pandemic, inflation and supply-chain issues.

46.     Although it was moving slowly before, in 2022 the Project stalled almost completely.

47.     Defendant Bruwer claimed that the further delays were caused by disputes between Bulson and various subcontractors, who supposedly refused to honor the terms of their respective subcontracts.

48.     With the Project so far behind and costs mounting, Plaintiff requested that the Defendants provide him with an updated schedule and definitive completion date.

49.     Defendants issued a detailed construction schedule on July 8, 2022, which set forth November 11, 2022 as the completion date.

50.     The Project, however, did not proceed pursuant to such schedule, even though Defendant Bruwer kept assuring Plaintiff that he was doing his very best.  Despite those claims, his communications became more worrisome over time.

51.     On October 19, 2022, he wrote: "I am finding it harder and harder to deliver your apartment yet we are spending triple the time and effort to keep things moving and at ever (sic) turn i (sic) am getting punched in the face."

52.     Shortly thereafter, Defendants represented that due to the Millwork Subcontractor's supposed refusal to perform pursuant to the subcontract with Bulson, the schedule would be delayed until at least March 2023.

53.     Defendants represented to Plaintiff that they were seeking bids from other millwork subcontractors for portions of the Millwork Subcontractor's work on the Project.

54.     Plaintiff requested that Defendants provide him with yet another updated schedule and definitive completion date; in response, on November 4, 2022, Defendants issued a new detailed schedule indicating March 24, 2023 as the completion date.

55.     Around this time, in the fall of 2022, Plaintiff also discovered that some of the work on the Project was not done pursuant to the drawings and specifications referenced in the Agreement (the "Contract Documents").

56.     The correction of such work would delay the completion of the Project for months (Defendant Bruwer estimated it would be an additional eight to ten weeks) and would significantly increase the expenses of the Project.

**Abandonment of the Project and Repudiation of the Agreement**

57.     When confronted by Plaintiff concerning the defective work and Plaintiff's dissatisfaction with the status of the Project in general, Defendant Bruwer, after weeks of ignoring Plaintiff's increasingly concerned communications, sent an alarming and hysterical email to Plaintiff on January 19, 2023, abandoning the Project and indicating his unwillingness to even communicate with Plaintiff going forward.

58.     Among other things, Defendant Bruwer wrote that:

   a.   "I have exhausted my personal funds to keep things afloat. I have not taken a salary in three years and have spent my entire personal savings to try and keep things afloat;"

   b.   "I can't fund the insurance;"

   c.   "i (sic) can't pay salaries;"

   d.   "Bulson was evicted from the office space;"

   e.   "I can't discuss your project and what is happening as an attorney needs to navigate the situation;" and

   f.   "I will not be taking your call or emails and if you want to discuss the project you can call Allen [one of Bulson's former employees]."

59.    The January 19 email was an unequivocal and unilateral repudiation of the Agreement by Bulson.

60.    The January 19 email left Plaintiff in an untenable position: he had expended most of his home improvement budget on Bulson by paying Bulson nearly one million dollars, and Bulson simply walked away with those funds, with less than half of the work done and over one and a half years after the original completion date set forth in the Agreement.

61.    Plaintiff's position was made much worse by Defendant Bruwer's refusal to communicate and failure to turn over Project-related documents to facilitate the replacement of Bulson by a new general contractor.

62.    As of today, Plaintiff must continue to pay the maintenance charges and make mortgage payments on the Premises even though the apartment is uninhabitable, while continuing to pay the rent on the apartment he moved into to accommodate the Project, as well as storage fees for items stored to accommodate the Project, together with insurance payments for the Premises, the rental apartment and the storage.

63.    Plaintiff has also already paid nine months of the monthly $500.00 alteration fees pursuant to the Alteration Agreement, and is expected by the Corporation to make further payments for each month that the Project is not completed.

64.    While the late charges due under the Alteration Agreement have not yet been assessed against Plaintiff by the Corporation, they may become due, as the completion date set forth in the Alteration Agreements passed on or about July 21, 2021.

**Revelations of Defendants' Pervasive Fraud**

65.    After Bulson abandoned the Project, Plaintiff discovered that Bulson failed to pay amounts due to the subcontractors, despite representations contained in each of the eight

applications for payment issued by Bulson and certified by Defendant Bruwer "…that all amounts payments (sic) received from the Owner, and that current payment shown herein is now due have been paid by [Bulson] for work for which previous Certificates for Payment were issued and that current payment shown here is now due…" and despite a Partial Lien Waiver, signed by Defendant Metoyer under penalty of perjury, which also represented to Plaintiff that Bulson paid all amounts due under the Agreement for services performed and materials and equipment provided with respect to the Project. See Exhibits B and C.

66.     After Defendant Bruwer took Bulson off the Project, several subcontractors informed Plaintiff that Defendant Bruwer misrepresented to them that they were not paid pursuant to their respective subcontracts because Plaintiff was not paying Bulson.

67.     On January 26, 2023, the HVAC Subcontractor wrote to Plaintiff that Bulson "said you were not paying them, that is why we pulled off the project so many times."

68.     On the same date, the HVAC Subcontractor also provided Plaintiff with its invoices, change orders, and proposals, as well as a payment ledger.

69.     As to the HVAC Subcontractor:

a.     According to the documents received from the HVAC Subcontractor, the subcontract price for its work, together with subsequent change orders, was $57,263.58;

b.     According to Plaintiff's records, until the time Bulson abandoned the Project, the entire amount due to the HVAC Subcontractor, together with the change orders, was $59,036.00 (see Exhibit C);

c. AFP No. 8 stated that, upon payment of the amounts requested under AFP No. 8, the amount paid to Bulson by Plaintiff for work completed and materials purchased by the HVAC Subcontractor would be $50,880.00 (see <u>Exhibit C</u>); and

d. According to the payment ledger provided by the HVAC Subcontractor, however, Bulson paid the HVAC Subcontractor only $30,112.39 to date, leaving a balance of $27,150.99.

70. Upon information and belief, Defendants diverted at least $20,767.61, the difference between what Plaintiff paid Bulson for the HVAC Subcontractor's work and materials and what Bulson actually paid to the HVAC Subcontractor, together with an additional payment of $5,799.36, which Plaintiff paid to Bulson for its overhead, labor, materials, and profit pursuant to the Agreement (each such additional payment, the "Bulson Markup"), for a total of $26,566.97.

71. Also on January 26, 2023, the Window Hardware Subcontractor sent Plaintiff its invoices, change orders, and proposals, as well as a payment ledger.

72. As to the Window Hardware Subcontractor:

a. According to the documents received from the Window Hardware Subcontractor, the subcontract price for its work, together with subsequent change orders, was $64,810.00;

b. According to these documents, the subcontract price promised to the Window Hardware Subcontractor by Bulson was higher than what was set forth in the Contract Documents and AFP No. 8;

c.  There were also additional change orders issued by the Window Hardware Subcontractor, resulting from Bulson's errors, which were not approved by Plaintiff;

d.  According to Plaintiff's records, until the time Bulson abandoned the Project, the entire amount due to the Window Hardware Subcontractor, together with the change orders, was $49,000.00 (see Exhibit C);

e.  AFP No. 8 stated that, upon payment of the amounts requested under AFP No. 8, the amount paid to Bulson by Plaintiff for work completed and items fabricated by the Window Hardware Subcontractor, would be $49,000.00 (see Exhibit C); and

f.  According to the documents provided by the Window Hardware Subcontractor, however, Bulson paid the Window Hardware Subcontractor only $36,554.00 to date, leaving a balance of $28,256.00.

73.  Upon information and belief, Defendants diverted at least $12,446.00, the difference between what Plaintiff paid Bulson for the Window Hardware Subcontractor's work and items fabricated and what Bulson actually paid to the Window Hardware Subcontractor, together with the Bulson Markup of $3,451.00, for a total of $15,897.00.

74.  Defendants presented Plaintiff with a change order in the amount of $7,600.00 for work to be done by the Window Hardware Subcontractor, which Plaintiff approved and paid, but, upon information and belief, neither originated with the Window Hardware Subcontractor nor was ever presented to it.

75.  As a result of Bulson's failure to pay the Window Hardware Subcontractor (including the higher subcontract price and the amounts due under the unapproved change

orders), the Project's completion was further delayed, and the Window Hardware Subcontractor has refused to deliver the items fabricated to date until paid in full.

76.    If Plaintiff wants to use the hardware manufactured by the Window Hardware Subcontractor, he must pay the outstanding balance claimed by the Window Hardware Subcontractor (which, because of the higher subcontract price and the unapproved change orders, is in excess of what is due under the Contract Documents), even though Plaintiff is certain that he already paid for the hardware in full. Alternatively, Plaintiff must hire a new subcontractor to duplicate the work performed by the Window Hardware Subcontractor, which would be even more costly and cause an even longer delay.

77.    On February 2, 2023, the Electrical Subcontractor wrote to Plaintiff as follows:

> We have been trying to follow up on payment with Bulson since last year. The work is 80% complete while they only paid us $16,375 out of the first work order. The 2 change orders/ additional work were not paid at all. They kept telling us they were not paid by you and therefore they couldn't pay us. I can't continue to work since I have not been paid since last March 2022. You claimed you paid them while Bulson claimed they were not paid by you. I am the only one losing as I had to pay my workers and for the materials used on your job. It is really unfortunate but please understand we are a small company and not getting paid for work really impacted the lives of everyone in my company.

78.    As to the Electrical Subcontractor:

a.    According to the Electrical Subcontractor's documents, the subcontract price for its work, together with subsequent change orders, was $44,250.00;

b.    According to Plaintiff's records, until the time Bulson abandoned the Project, the entire amount due to the Electrical Subcontractor, together with the change orders, was $61,565.00 (see Exhibit C);

c.  AFP No. 8 stated that, upon payment of the amounts requested under AFP No. 8, the amount paid to Bulson by Plaintiff for work completed and materials purchased by the Electrical Subcontractor would be $52,272.50 ($8,022.50 more than the entire subcontract price due to the Electrical Subcontractor) (see Exhibit C); and

d.  According to the Electrical Subcontractor, however, Bulson paid the Electrical Subcontractor only $16,375.00 to date, leaving a balance of $27,875.00.

79.  Upon information and belief, Defendants diverted at least $35,897.50, the difference between what Plaintiff paid Bulson for the Electrical Subcontractor's work and materials and what Bulson actually paid to the Electrical Subcontractor, together with the Bulson Markup of $9,972.33, for a total of $45,869.83.

80.  Also on February 2, 2023, Glass & Mirror wrote to Plaintiff as follows: "We provided an official quota (sic) and sent out a contract, but it all stopped there."

81.  Upon information and belief, Glass & Mirror was never retained by Bulson and never provided any labor or materials for the Project.

82.  As to Glass & Mirror:

a.  According to the documents received from Glass & Mirror, its proposal contained a subcontract price of $24,000.00;

b.  According to Plaintiff's records, until the time Bulson abandoned the Project, the entire amount due to Glass & Mirror, together with the change orders, was $33,175.00 (see Exhibit C);

15

c.  AFP No. 8 stated that, upon payment of the amounts requested under AFP No. 8, the amount paid to Bulson by Plaintiff for work completed and materials purchased by Glass & Mirror would be $11,671.50 (see Exhibit C).

83.  Upon information and belief, Defendants diverted at least $11,761.50, the funds Plaintiff paid Bulson for Glass & Mirror's non-existent work and materials, together with the Bulson Markup of $3,293.22, for a total of $15,024.72.

84.  On February 8, 2023, the Millwork Subcontractor provided Plaintiff its subcontracts with Bulson, together with proof of payment received from Bulson to date.

85.  As to the Millwork Subcontractor:

a.  According to the documents received from the Millwork Subcontractor, the subcontract price for its work under the three subcontracts was $220,520.00;

b.  According to Plaintiff's records, until the time Bulson abandoned the Project, the entire amount due to the Millwork Subcontractor, together with the change orders, was $414,758.00 (see Exhibit C);

c.  AFP No. 8 stated that, upon payment of the amounts requested under AFP No. 8, the amount paid to Bulson by Plaintiff for work completed and materials purchased by the Millwork Subcontractor would be $269,560.62 ($49,040.62 more than the real subcontract price due to the Millwork Subcontractor) (see Exhibit C); and

d.  According to the documents provided by the Millwork Subcontractor, however, Bulson paid the Millwork Subcontractor only $52,647.50 to date, leaving a balance of $167,872.50.

86.     Upon information and belief, Defendants diverted at least $216,913.12, the difference between what Plaintiff paid Bulson for the Millwork Subcontractor's work and materials and what Bulson actually paid to the Millwork Subcontractor, together with the Bulson Markup of $61,835.42, for a total of $278,748.54.

87.     On February 9, 2023, the Plumbing Subcontractor provided Plaintiff with its payment ledger.

88.     As to the Plumbing Subcontractor:

    a.  According to the payment ledger received from the Plumbing Subcontractor, the subcontract price for its work, together with subsequent change orders, was $44,500.00;

    b.  According to these documents, the subcontract price promised to the Plumbing Subcontractor by Bulson was higher than what was set forth in the Contract Documents and AFP No. 8;

    c.  According to Plaintiff's records, until the time Bulson abandoned the Project, the entire amount due to the Plumbing Subcontractor, together with the change orders, was $30,000.00 (see Exhibit C);

    d.  AFP No. 8 stated that, upon payment of the amounts requested under AFP No. 8, the amount paid to Bulson by Plaintiff for work completed and materials purchased by the Plumbing Subcontractor would be $27,150.00 (see Exhibit C); and

    e.  According to the documents provided by the Plumbing Subcontractor, however, Bulson paid the Plumbing Subcontractor only $15,648 to date, leaving a balance of $28,852.00.

89. Upon information and belief, Defendants diverted at least $11,502.00, the difference between what Plaintiff paid Bulson for the Plumbing Subcontractor's work and materials and what Bulson actually paid to the Plumbing Subcontractor, together with the Bulson Markup of $3,198.71, for a total of $14,700.71.

90. If Plaintiff wants the Plumbing Subcontractor to continue on the Project, he must pay the outstanding balance claimed by the Plumbing Subcontractor, which, because of the higher subcontract price, is in excess of what is due under the Contract Documents.

91. On February 15, 2023, the Flooring Subcontractor provided Plaintiff with its proposal, payment ledger, and Liens Waiver provided to it by Bulson.

92. As to the Flooring Subcontractor:

    a. According to the documents received from the Flooring Subcontractor, the subcontract price for its work, together with subsequent change orders, was $12,418.00;

    b. According to these documents, the subcontract price promised to the Flooring Subcontractor by Bulson was higher than what was set forth in the Contract Documents and AFP No. 8;

    c. According to Plaintiff's records, until the time Bulson abandoned the Project, the entire amount due to the Flooring Subcontractor, together with the change orders, was $8,460.00 (see Exhibit C);

    d. AFP No. 8 stated that, upon payment of the amounts requested under AFP No. 8, the amount paid to Bulson by Plaintiff for work completed and materials purchased by the Flooring Subcontractor would be $7,191.00 (see Exhibit C); and

e.  According to the documents provided by the Flooring Subcontractor, however, Bulson paid the Electrical Subcontractor only $6,000.00 to date, leaving a balance of $6,418.00.

93.  Upon information and belief, Defendants diverted at least $1,191.00, the difference between what Plaintiff paid Bulson for the Flooring Subcontractor's work and materials and what Bulson actually paid to the Flooring Subcontractor, together with the Bulson Markup of $335.05, for a total of $1,526.05.

94.  If Plaintiff wants the Flooring Subcontractor to continue on the Project, he must pay the outstanding balance claimed by the Flooring Subcontractor, which, because of the higher subcontract price, is in excess of what is due under the Contract Documents.

95.  Upon information and belief, Bulson never contracted with a subcontractor for epoxy floor treatments.

96.  Despite that, Bulson allocated the amount of $7,775.00 for such work, of which Plaintiff was charged and paid Bulson $3,887.50.

97.  Upon information and belief, Defendants diverted at least $3,887.50, the funds paid by Plaintiff for the epoxy floor treatments, for which Bulson never even retained a subcontractor, together with the Bulson Markup of $1,093.51 paid in connection with such diverted funds, for the total of $4,981.01.

98.  Upon information and belief, Bulson never contracted with a supplier for the purchase of Lapitec stone.

99.  Despite that, Bulson charged Plaintiff the amount of $17,827.00 for the purchase of Lapitec stone, which Plaintiff paid to Bulson.

19

100.     Upon information and belief, Defendants diverted at least $17,827.00, the funds paid by Plaintiff for the purchase of Lapitec stone, for which Bulson never even retained a supplier, together with the Bulson Markup fee of $4,635.02 paid in connection with such diverted funds, for the total of $22,462.02.

101.     Upon information and belief, Bulson never purchased certain kitchen appliances specified in the Contract Documents.

102.     Despite that, Bulson charged Plaintiff the amount of $22,883.00 for such appliances, which Plaintiff paid to Bulson.

103.     Upon information and belief, Defendants diverted at least $22,883.00, the funds paid by Plaintiff for the purchase of such appliances, which Bulson never purchased, together with the Bulson Markup of $4,090.04 paid in connection with such diverted funds, for the total of $26,973.04.

104.     Upon information and belief, Bulson never purchased certain radiant floor mats specified in the Contract Documents.

105.     Despite that, Bulson charged Plaintiff the amount of $1,965.00 for the purchase of such floor mats, which Plaintiff paid to Bulson.

106.      Upon information and belief, Defendants diverted at least $1,965.00, the funds paid by Plaintiff for the purchase of radiant floor mats, which Bulson never purchased, together with the Bulson Markup of $510.90 paid in connection with such diverted funds, for the total of $2,475.90.

107.     If Plaintiff wants a subcontractor to continue working on the Project, he must pay the respective outstanding balance claimed by it, even though Plaintiff already paid for the subcontractor's work with funds apparently diverted by Defendants.

108.     Upon information and belief, Defendants inflated and misrepresented to Plaintiff the cost of the work of some of the subcontractors in order to keep some or all of the payments for themselves.

109.     Upon information and belief, Defendants, acting in concert, misrepresented to Plaintiff that they ordered certain supplies, materials, and appliances, when in fact they had not done so, in order to keep some or all of the payments for themselves.

110.     Plaintiff, in good faith, relied on Defendants' assurances and the representations contained in all eight applications for payment, certified by Defendant Bruwer, and the Partial Lien Waiver, sworn to by Defendant Metoyer, that all amounts due for labor and materials to Bulson and its subcontractors were paid, and to make a further payment in connection with the Project, which Defendants represented to Plaintiff were due.

111.     Plaintiff, also in good faith, relied on the numerous representations made by Defendants regarding the price of the change orders and paid Bulson accordingly, including for at least one fictitious change order.

**Defendants are Serial Fraudsters**

112.     Apparently, Plaintiff is not the only victim of Defendants' ineptitude and dishonesty.

113.     In recent years, Defendants have been sued in a number of lawsuits, with substantially identical fact patterns involving alleged failure to complete projects along with allegations of fraud and the unlawful diversion of project funds.

114.     It is apparent that Bulson, Defendant Bruwer and/or Defendant Metoyer are serial fraudsters who bilk their customers and divert the project's funds paid to them in trust.

**Status of the Project and Plaintiff's Damages**

115.   As a result of Bulson and Defendants' actions, the Premises are not habitable or marketable.

116.   Pursuant to New York Lien Law § 76, Plaintiff requested the production of books and records from Defendant Bruwer and Defendant Metoyer, which they are obligated to maintain and produce upon request pursuant to New York Lien Law § 75.

117.   Defendants have ignored Plaintiff's request for books and records.

118.   Bulson's failure to pay the subcontractors, the immense delays of the Project, its continued requests for payments despite lack of timely progress, its improper abandonment of the Project, and Defendants' misrepresentations and omissions, on which Plaintiff reasonably relied, exposed Plaintiff, and continues to expose Plaintiff, to significant financial damages.

119.   Such damages include, but are not limited to, the amounts paid for work not done and materials/equipment not purchased, the funds diverted by Defendants, the amounts that Plaintiff will incur in order to correct nonconforming and defective work, the amounts Plaintiff will be forced to pay to retain a new general contractor to complete the Project, the carrying costs of the Premises that Plaintiff is forced to bear as the result of the delays caused by Defendants, the late fees and monthly alteration fees payable to the Corporation in which the Premise is located because of Bulson's delays, the rental and storage payments, and the rental and storage insurance payments.

## AS AND FOR A FIRST CAUSE OF ACTION

(Production of Books and Records under Article 3-A of New York Lien Law against Defendants)

120.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 119 as if each was fully set forth herein.

121.    Upon information and belief, Bulson is a trustee of the trust funds within the meaning of Article 3-A of the New York Lien Law.

122.    Upon information and belief, Defendant Bruwer is the principal and/or an individual controlling the business operations of Bulson, specifically with the improvements made in connection with the Project.

123.    Upon information and belief, Defendant Metoyer is the Comptroller of Bulson, and was the Comptroller of Bulson during all relevant times, and acted in concert with Defendant Bruwer to defraud Plaintiff.

124.    Plaintiff is a beneficiary of the trust funds within the meaning of Article 3-A of the New York Lien Law.

125.    Upon information and belief, Defendants knew that trust funds were to be held and applied for expenditures arising out of the improvement of the Project.

126.    Upon information and belief, Defendants failed to properly keep and maintain books and records relating to the trust funds. New York Lien Law § 75.

127.    Defendants failed to produce the books and records relating to the trust funds for examination and copying, despite Plaintiff's request that they do so pursuant to New York Lien Law § 76.

128.    By reason of the foregoing, Plaintiff demands the production of books and records relating to the trust funds, which they are obligated to maintain pursuant to N.Y. Lien Law § 75

and produce pursuant to New York Lien Law § 76.

## AS AND FOR A SECOND CAUSE OF ACTION
(Fraud)

129.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 128 as if each was fully set forth herein.

130.    Throughout the Project, Defendant Bruwer made a number of misrepresentations and/or omissions of material facts to Plaintiff, including, but not limited to: (a) that all amounts due to be paid in connection with the Project by Bulson were paid; (b) that the amounts for the change orders payable to subcontractors were accurate; (c) that the subcontract prices were accurate; and (d) that the funds paid to Bulson will be used solely for the Project.

131.    Throughout the Project, Defendant Metoyer made a number of misrepresentations and/or omissions of material facts to Plaintiff, including, but not limited to: (a) that all amounts due to be paid in connection with the Project by Bulson were paid; (b) that the amounts for the change orders payable to subcontractors were accurate; (c) that the subcontract prices were accurate; and (d) that the funds paid to Bulson would be used solely for the Project.

132.    Defendant Bruwer, as the sole principal of Bulson, caused Bulson to make the aforementioned misrepresentations and/or omissions, on which Plaintiff relied in good faith.

133.    Defendant Metoyer executed the Partial Lien Waiver under the penalty of perjury, representing to Plaintiff that Bulson paid all amounts due under the Agreement for services performed and materials and equipment provided with respect to the Project, on which representations Plaintiff relied and base upon which Plaintiff made a further payment to Bulson.

134.    Upon information and belief, Defendants, working in concert with each other, knew the aforementioned misrepresentations and/or omissions were false.

135.    Defendants made the aforementioned misrepresentations and/or omissions with

the intent to wrongfully extract payments from Plaintiff for the Project, which they intended to divert for their own use and benefit.

136.    Plaintiff reasonably relied on Defendants' misrepresentations and omissions to his detriment.

137.    Because Defendants' actions demonstrate a high degree of moral culpability and reflect a wanton and/or reckless disregard of the rights of Plaintiff, punitive as well as compensatory damages should be awarded to Plaintiff.

138.    By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff in an amount to be determined at trial, but not less than $972,202.97, together with punitive damages, interest, attorneys' fees, costs and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

139.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 138, as if each was fully set forth herein.

140.    Defendant Bruwer, as a principal and officer of Bulson, and Defendant Metoyer, as an officer, owed Plaintiff a fiduciary duty to refrain from causing Bulson to misappropriate, and/or to themselves refrain from misappropriating, monies paid to Bulson in trust per Article 3-A of the New York Lien Law.

141.    Defendant Bruwer and Defendant Metoyer breached their fiduciary duty by making numerous misrepresentations to Plaintiff in connection with the status of the Project and payments due in connection therewith, and by diverting Plaintiff's funds paid to Bulson in trust.

142.    Defendant Bruwer's and Defendant Metoyer's breach of fiduciary duty damaged Plaintiff in an amount to be determined at trial, but no less than $972,202.97.

143.    Defendant Bruwer's and Defendant Metoyer's actions and statements demonstrate

a high degree of moral culpability and reflect a wanton and/or reckless disregard of Plaintiff's rights. Accordingly, punitive damages should be awarded to Plaintiff.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

144.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 143, as if each was fully set forth herein.

145.    Pursuant to Article 3-A of New York Lien Law Defendant Bruwer and Defendant Metoyer owed Plaintiff a fiduciary duty.

146.    Plaintiff relied on the misrepresentations made by Defendants.

147.    Defendant Bruwer and Defendant Metoyer breached their fiduciary duty by making numerous misrepresentations to Plaintiff in connection with the status of the Project and payments due in connection therewith, and by diverting Plaintiff's funds paid to Bulson in trust.

148.    Defendants have been unjustly enriched and Plaintiff has suffered, and is continuing to suffer, substantial damages.

149.    By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff in an amount to be determined at trial, but not less than $972,202.97, together with punitive damages, interest, attorneys' fees, costs and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Constructive Trust)

150.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 149, as if each was fully set forth herein.

151.    Pursuant to Article 3-A of New York Lien Law Defendant Bruwer and Defendant Metoyer owed Plaintiff a fiduciary duty.

152.    Defendant Bruwer and Defendant Metoyer breached their fiduciary duty by

making numerous misrepresentations to Plaintiff in connection with the status of the Project and payments due in connection therewith, and by diverting Plaintiff's funds paid to Bulson in trust.

153.    Plaintiff relied, to his detriment, on the promises and misrepresentations made by Defendants.

154.    By their conduct, Defendants were enriched at Plaintiff's expense, and it is against equity and good conscience to permit Defendants to retain the amounts paid by Plaintiff to Bulson and diverted by Defendants.

155.    Defendants have been unjustly enriched and Plaintiff has suffered, and is continuing to suffer, substantial damages.

156.    By reason of the foregoing, Plaintiff is entitled to an order of the Court, directing that Defendants place the funds paid by Plaintiff to Bulson, in the amount to be determined at trial, but not less than $972,202.97, in a constructive trust for Plaintiff's benefit.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a)    On the First Cause of Action, compelling the Defendants to produce the books and records they are obligated to maintain and produce pursuant to New York Lien Law §§ 75 and 76, and granting such other and further relief as the Court may deem just and proper;

b)    On the Second Cause of Action, awarding judgment against Defendants, jointly and severally, for compensatory damages in an amount to be determined by the Court, but not less than $972,202.97, together with punitive damages, interest, attorneys' fees, costs and disbursements, and granting such other and further relief as the Court may deem just and proper;

c)    On the Third Cause of Action, awarding judgment against Defendants, jointly and severally, for compensatory damages in an amount to be determined by the Court, but not less than $972,202.97, together with punitive damages, interest, attorneys' fees, costs and

disbursements, and granting such other and further relief as the Court may deem just and proper;

       d)      On the Fourth Cause of Action, awarding judgment against Defendants, jointly and severally, for compensatory damages in an amount to be determined by the Court, but not less than $972,202.97, together with punitive damages, interest, attorneys' fees, costs and disbursements, and granting such other and further relief as the Court may deem just and proper; and

       e)      On the Fifth Cause of Action, imposing a constructive trust in favor of Plaintiff, against Defendants, and granting such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
          March 1, 2023

                                     MANDEL AKSELROD, P.C.
                                     40 Exchange Place, Suite 1203
                                     New York, New York 10005
                                     (212) 668-1700
                                     Eric Wertheim – ew@vmdalaw.com
                                     Daniel Akselrod – da@vmdalaw.com
                                     *Attorneys for Plaintiff*

                                   By: *<ins>/s/ Daniel Akselrod</ins>*
                                        Daniel Akselrod

28