UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------- X
                                                                         :
JOSHUA RAMUS,                                                            :
                                                                         :
                              Plaintiff,                                 :
                                                                         :
           -v-                                                           :        23 Civ. 1770 (JPC)
                                                                         :
GRAHAM R. BRUWER and GERARD E. METOYER,                                  :        OPINION AND ORDER
                                                                         :
                              Defendants.                                :
                                                                         :
----------------------------------------------------------------------- X

JOHN P. CRONAN, United States District Judge:

　　This civil action follows the failed renovation of a New York City apartment.  Joshua Ramus, the owner of the apartment, engaged Bulson Management, LLC ("Bulson") to serve as the project's general contractor.  Over the life of the project, Ramus allegedly paid Bulson almost a million dollars, a portion of which was intended to cover payments owed to Bulson's subcontractors and suppliers.  But then, with more than half the work left to do, Ramus claims that Bulson abandoned the project, leaving Ramus in a lurch.  And to make matters worse, Ramus later learned that Bulson had not been making all required payments to its subcontractors and suppliers for their work on the ill-fated project.

　　With Bulson now in bankruptcy, its subcontractors and suppliers left high and dry, and the project still unfinished, Ramus asserts causes of action against two of the company's officers—Graham R. Bruwer and Gerard E. Metoyer.  Ramus alleges claims for fraud, breach of fiduciary duty for diversion of trust funds under the New York Lien Law (the "Lien Law"), unjust enrichment, and constructive trust.  Ramus also seeks to compel the production of Bulson's books and records relating to the construction project.  Bruwer and Metoyer move to dismiss this action

in full under Federal Rule of Civil Procedure 12(b)(6) or, alternatively, to stay this case pending the outcome of an arbitration proceeding against Bulson. For the following reasons, the Court grants the motion to dismiss in part and denies it in part, and denies Bruwer and Metoyer's request for a stay.

## I. Background

### A. Factual Background[1]

Bulson is part of a "bi-coastal construction business" with offices in New York City and Los Angeles. Compl. ¶ 6. The company holds itself out as a "high-end contractor" specializing in "bespoke remodeling" for residential and commercial properties alike. *Id.* ¶ 7. In Bulson's words, its "team is deeply experienced bringing architectural plans and client dreams to life." *Id.* During the times relevant to this case, Bruwer was Bulson's Chief Executive Officer while Metoyer served as the company's Comptroller. *Id.* ¶¶ 11-12. Bruwer was also Bulson's founder and sole member. *Id.* ¶ 10.

Ramus owns the shares corresponding to a cooperative apartment located in Tribeca. *Id.* ¶ 8. On August 6, 2020, Ramus and Bulson executed an American Institute of Architects Document A105-2017, Standard Short Form of Agreement Between Owner and Contractor. *Id.* ¶ 9; *see* Compl. Exh. A ("Agreement"). Bruwer signed the Agreement on Bulson's behalf as the company's CEO. Compl. ¶ 11.

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Complaint, Dkt. 1 ("Compl."), and the exhibits attached to the Complaint. *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor").

Pursuant to the Agreement, Bulson agreed to "serve as the general contractor for the complete renovation" of Ramus's apartment. *Id.* ¶ 9. The project was scheduled to commence on August 17, 2020, with a substantial completion date of July 13, 2021. *Id.* ¶¶ 15, 17. The Agreement initially provided that the total cost of the project would be $1,275,811.00, but that cost was revised upwards to $1,388,078.00 pursuant to various change orders. *Id.* ¶¶ 19-20.

The Agreement contemplated a schedule of periodic payments and specified how Bulson would be paid. Under that system, Bulson was required to submit an Application for Payment for Work (an "AFP") to Ramus's architect at least ten days prior to the date set for each progress payment. Agreement § 12.2.1. Each AFP was required to be "supported by data substantiating [Bulson's] right to payment as [Ramus or his architect] may reasonably require, such as evidence of payments made to, and waivers of liens from, subcontractors and suppliers." *Id.* The Agreement further provided that:

> [Bulson] warrants that title to all Work covered by an [AFP] will pass to [Ramus] no later than the time of payment. [Bulson] further warrants that upon submittal of an [AFP], all Work for which Certificates of Payment have been previously issued and payments received from [Ramus] shall, to the best of [Bulson's] knowledge, information, and belief, be free and clear of liens, claims, security interests, or other encumbrances adverse to [Ramus's] interests.

*Id.* § 12.2.2.

Within seven days after receiving an AFP, Ramus's architect was required to either issue a certificate for payment in the full amount of the AFP, issue a certificate for payment in a different amount that the architect determined was properly due and notify Ramus and Bulson in writing of the reasons for the architect withholding certification in part, or withhold certification of the entire AFP and provide a statement of reasons for the architect's decision to withhold certification. *Id.* § 12.3. Once the architect issued a certificate for payment, Ramus was then required to pay the amount certified within five business days. *Id.* §§ 4.1, 12.4.1. It was Bulson's responsibility,

3

however, to pay its subcontractors and suppliers, and under the Agreement it was obligated to "promptly" do so upon receiving the funds requested through its AFPs. *Id.* § 12.4.2; *see also id.* § 12.4.3 (providing that neither Ramus nor his architect "shall have responsibility for payments to a subcontractor or supplier").

The Agreement also required Bulson to execute a partial lien waiver in connection with each progress payment. *Id.* § 4.1. The template provided in the Agreement required Bulson to include in each partial lien waiver a representation and warranty that "all its subcontractors, all labor, materials, and equipment, including all social security taxes, withholding taxes, sales and use taxes, permits and workers compensation, union payments and insurance premiums in connection with performance of the [Agreement] have been fully paid and discharged for all work done and material[s] supplied to date." *Id.* The template also stated that "[Bulson] acknowledges that [Ramus] is relying upon the truth of the statements" in that representation. *Id.*

As the project progressed, Bulson issued AFPs and supporting documents pursuant to the Agreement, "which itemized the payments to be paid [by Ramus] to Bulson and the subcontractors for labor and materials." Compl. ¶ 37. Upon receiving the corresponding AFPs and partial lien waivers from Bulson, Ramus made payments to the company as set forth in the following table:

| Date | Amount |
|------|--------|
| November 26, 2019 | $19,159.50 |
| January 2, 2020 | $19,159.50 |
| February 28, 2020 | $10,410.60 |
| October 14, 2020 | $334,013.70 |
| February 25, 2021 | $123,181.87 |
| September 8, 2021 | $174,542.47 |
| November 9, 2021 | $82,611.05 |
| December 23, 2021 | $35,477.42 |
| February 7, 2022 | $65,134.87 |
| March 28, 2022 | $27,300.00 |
| April 18, 2022 | $40,342.00 |
| June 22, 2022 | $40,870.00 |

*Id.* ¶ 38.  In total, Ramus paid Bulson $972,202.97 over the course of the project.  *Id.* ¶¶ 38-39.[2]

Ramus alleges that these payments became "assets of a trust of which [Ramus] is a beneficiary"

pursuant to Article 3-A of the Lien Law.  *Id.* ¶ 40.

Ramus made the final payment listed in the chart above—for $40,870.00—pursuant to AFP

No. 8 and a partial lien waiver dated June 24, 2022.  *See* Compl. Exhs. B ("Partial Lien Waiver"),

---

[2] Although the twelve individual payments add up to $972,202.98, the Complaint states
that Ramus paid Bruwer a total of $972,202.97 and seeks compensatory damages in that amount.
*Compare* Compl. ¶ 38, *with id.* ¶¶ 39, 138, 142, 149, 156.

C ("AFP No. 8").[3]  AFP No. 8, which was signed by Bruwer on Bulson's behalf, contained the following representation:

> The undersigned Contractor [Bulson] certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts payments received from the Owner, and that current payment shown herein is now due[]have been paid by the Contractor for work for which previous Certificates for Payment were issued and that current payment shown herein is now due.

AFP No. 8 at 1.  AFP No. 8 listed the "current payment due" as $40,870.00 and noted that Ramus had already paid $931,332.98 pursuant to prior certificates for payment.  *Id.*  AFP No. 8 attached various spreadsheets, described different categories of work and supplies contemplated under the Agreement, and documented amounts associated with the scheduled and completed values of the work and supplies.  *See id.* at 2-4.

Metoyer signed the Partial Lien Waiver on Bulson's behalf.  Partial Lien Waiver at 2. Consistent with AFP No. 8, the Partial Lien Waiver stated that the current payment due from Ramus was $40,870.00 and noted that Bulson had previously received $931,332.98 from Ramus under the Agreement.  *Id.* at 1.  As required under the Agreement, the Partial Lien Waiver also contained the following representation:

> The Contractor [Bulson] certifies, warrants, and represents that: (a) upon receipt and collection of the Current Payment, it will be paid in accordance with all applicable Contract obligations for all work, labor, and services performed, and materials and equipment provided, with respect to the Project; (b) except for sums to be dispersed from the proceeds of the Current Payment, it owes no one for any labor, services, tools, equipment, materials, taxes, insurance premiums or any other item of cost or expense in connection with the performance or furnishing of the Work under the Contract; and (c) no unresolved and outstanding claims have been made against the Contractor by any subcontractor or material supplier for any unpaid labor, services,

---

[3] Although AFP No. 8 is associated with the final payment under the Agreement, that payment, as alleged, was the twelfth one that Ramus made.  *See* Compl. ¶ 38.

materials, tools, equipment, or any other item of cost and expense arising out of or relating to the Work under the Contract that are not currently paid and satisfied.

*Id.* ¶ 2.  Under the Partial Lien Waiver, Bulson "further warrant[ed] and represent[ed]" that the current payment due and the amount previously paid "are trust funds (as defined by the NY Lien Law) received for the purpose of paying all claims for labor and/or materials and [Bulson] will apply all payments received for said purpose before using any part thereof for any other purpose." *Id.* ¶ 3.

Despite Ramus's timely payments, the project slowed down and then "stalled almost completely" in 2022.  Compl. ¶¶ 41, 46.  Bruwer "blamed the slow progress of the Project on the COVID-19 pandemic, inflation and supply-chain issues."  *Id.* ¶ 45.  Bruwer also "claimed that the further delays were caused by disputes between Bulson and various subcontractors, who supposedly refused to honor the terms of their respective subcontracts."  *Id.* ¶ 47.  For example, Bruwer claimed that its millwork subcontractor was "refus[ing] to perform pursuant to the subcontract with Bulson," and that this would delay the project by several months.  *Id.* ¶ 52.  Then, in the fall of 2022, Ramus further "discovered that some of the work on the Project was not done pursuant to the drawings and specifications referenced in the Agreement."  *Id.* ¶ 55.

After Ramus confronted Bulson regarding the "defective work" on the project and expressed his "dissatisfaction with the status of the Project in general," Bruwer responded by sending "an alarming and hysterical email" to Ramus on January 19, 2023.  *Id.* ¶ 57.  In that email, Bruwer suggested that Bulson's business was collapsing and stated that going forward, he would refuse to communicate with Ramus directly.  *Id.* ¶ 58.  Ramus alleges that the January 19 email "was an unequivocal and unilateral repudiation of the Agreement by Bulson."  *Id.* ¶ 59.

Following Bulson's "abandon[ment]" of the project, Ramus "discovered that Bulson failed to pay amounts due to [its] subcontractors."  *Id.* ¶ 65.  Those subcontractors, for their part, claimed

that Bruwer had "misrepresented to them that they were not paid pursuant to their respective subcontracts because [Ramus] was not paying Bulson." *Id.* ¶ 66.  Ramus alleges that as a result of Bulson's failure to pay is subcontractors, if he "wants a subcontractor to continue working on the Project, he must pay the respective outstanding balance claimed by it, even though [he] already paid for the subcontractor's work with funds apparently diverted by [Bruwer and Metoyer]." *Id.* ¶ 107.  Ramus further alleges that Bulson's AFPs misstated certain actual or contemplated expenditures in connection with the project.  *Id.* ¶¶ 95-108.

**B.    Procedural History**

Ramus filed this action against Bruwer and Metoyer on March 1, 2023.  Dkt. 1.  Ramus's Complaint asserts five causes of action: production of books and records under Article 3-A of the Lien Law (First Cause of Action), fraud (Second Cause of Action), breach of fiduciary duty (Third Cause of Action), unjust enrichment (Fourth Cause of Action), and constructive trust (Fifth Cause of Action).  *Id.* ¶¶ 120-156.  Ramus's causes of action for fraud, breach of fiduciary duty, and unjust enrichment seek identical measures of damages and other relief.  *Id.* at 27-28.

Five months later, on August 23, 2023, Ramus commenced an arbitration proceeding against Bulson itself.  Dkt. 49-1 ("Arb. Pet.").  That proceeding asserted causes of action for fraud, breach of contract, and breach of fiduciary duty, *id.* ¶¶ 99-113, based on factual allegations substantially identical to those presented in Ramus's Complaint*, see id.* ¶¶ 57-98.  Ramus's arbitration petition also sought the same measures of damages as his Complaint.  *Id.* at 18.  But then, on March 6, 2024, Bulson filed for bankruptcy, which automatically stayed the arbitration. Dkt. 50-1 ¶ 7.

On August 29, 2024, Bruwer and Metoyer moved to dismiss Ramus's Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, to stay this

action pending the outcome of the arbitration against Bulson.  Dkts. 48, 49 ("Motion").  Ramus

opposed the Motion on September 19, 2024, Dkt. 50 ("Opposition"), and Bruwer and Metoyer

filed a reply three weeks later, Dkt. 51 ("Reply").  With the Court's permission, Ramus then filed

a surreply to address arguments raised for the first time in Bruwer and Metoyer's Reply.  Dkt. 56

("Surreply").

## II.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In other words,

the Rule 12(b)(6) plausibility standard requires factual allegations sufficient to "'raise a reasonable

expectation that discovery will reveal evidence' of the wrongdoing alleged."  *Citizens United v.*

*Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556).

## III.  Discussion

### A.    Fraud

Ramus asserts a cause of action for fraud premised on alleged misstatements in AFP No. 8

and the Partial Lien Waiver concerning Bulson's expenses and whether it was complying with its

contractual obligation to pay its subcontractors and suppliers under the Agreement.  Opposition at

4, 7; *see* Compl. ¶¶ 129-138.[4]  Bruwer and Metoyer principally seek dismissal of Ramus's fraud

---

[4]  Ramus vaguely alludes to other false statements, including "hundreds of e-mails"
exchanged between the parties.  Opposition at 7.  But the only statements that Ramus pleads with
particularity and substantively addresses in his briefing are those contained in AFP No. 8 and the
Partial Lien Waiver.  *See infra* n.11.  The Court therefore does not consider additional statements
and theories of fraud that Ramus either failed to plead with particularity or did not substantively

claim on the ground that the claim impermissibly seeks to recover in tort for Bulson's alleged breach of its contractual obligations under the Agreement. Motion at 5-7. The Court agrees, and dismisses the fraud claim on that ground.

Under New York law,[5] it is well-settled that "a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (internal quotation marks omitted); *see also Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*, 681 F. Supp. 3d 81, 102 (S.D.N.Y. 2023) ("[A] cause of action for fraud will not arise when the only fraud charged relates to a breach of contract." (quoting, in turn, *Trusthouse Forte (Garden City) Mgmt., Inc. v. Garden City Hotel, Inc.*, 483 N.Y.S.2d 216, 218 (1st Dep't 1984))). Under this principle, a plaintiff may not "sue the corporation ([which] was a party to the contract) for breach of contract, and then bring a separate suit for fraud against the individual who represented the corporation, thereby bringing duplicative fraud and breach of contract claims." *Lefkowitz v. Reissman*, No. 12 Civ. 8703 (RA), 2014 WL 925410, at *5 n.1 (S.D.N.Y. Mar. 7, 2014). To avoid that result, "[c]ourts applying New York law routinely hold that representations by a non-party made on behalf of the contracting party may be duplicative of the contract claim against the contracting party." *Clarke v. TRIGO U.S., Inc.*, No. 22 Civ. 1917 (PKC), 2023 WL 6806074, at *4 (S.D.N.Y. Oct. 16, 2023).

---

defend in his briefing. *See Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, No. 23 Civ. 2138 (JPC), 2024 WL 4354809, at *10 n.12 (S.D.N.Y. Sept. 30, 2024) (deeming forfeited or abandoned additional theories of fraud that the plaintiff's "briefing [did] not address, or addresse[d] only in the most cursory fashion").

[5] The parties do not address choice of law, but instead assume that New York law governs each of Ramus's causes of action. *See, e.g.*, Motion at 6; Opposition at 8. The Court therefore applies New York law in resolving Bruwer and Metoyer's Motion. *See Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (internal quotation marks and alteration omitted)).

In this case, Ramus's fraud claim against Bruwer and Metoyer—which is based on statements that they made in a representative capacity and which were contractually required to be made in connection with Bulson's course of performance under the Agreement—is an impermissible attempt to seek a tort recovery for Bulson's alleged breach of contract.

First, there is almost no daylight between the factual allegations supporting Ramus's fraud claim and allegations needed to state a claim for breach of contract against Bulson.  Ramus's fraud claim rests on the theory that, in carrying out Bulson's contractual duty to submit requests to Ramus for payment, Bruwer and Metoyer represented that Bulson had complied with its obligation to fully compensate its subcontractors and suppliers, when in actuality it had not made the full amount of those payments.  Compl. ¶¶ 130-133.  The claim also points to alleged misstatements of expenditures in Bulson's invoices.  *See id.*  Each of these failures, however, amounts to a breach of the Agreement, which required Bulson to pay its subcontractors, to truthfully represent that it had done so in its AFPs and partial lien waivers, and to provide accurate statements regarding its expenditures.  *See* Agreement §§ 4.1, 12.2, 12.4.  Thus, Ramus's fraud claim against Bruwer and Metoyer "arise[s] from the same allegations" and would "necessarily require the same proof" as a breach of contract claim against Bulson.  *Kriegel v. Donelli*, No. 11 Civ. 9160 (ER), 2014 WL 2936000, at *14 (S.D.N.Y. June 30, 2014); *see Banco de La Republica de Colombia v. Bank of N.Y. Mellon*, No. 10 Civ. 536 (AKH), 2013 WL 3871419, at *10 (S.D.N.Y. July 26, 2013) (holding that false certifications issued pursuant to a contract between the parties were not actionable through a fraud claim because the fraud claim would "necessarily require[] the same proof" as a breach of contract claim concerning the same subject matter).

Second, Ramus only seeks forms of compensatory damages that would be available in a breach of contract action against Bulson—indeed, the *exact same* measure of damages that he is

seeking against Bulson in arbitration. *Compare* Compl. ¶ 138, *with* Arb. Pet. ¶ 108.  The complete

overlap between the damages that Ramus alleges he suffered due to Bulson's breach of contract

and those he attributes to Bruwer and Metoyer's fraud further suggests that there is no material

difference between Bulson's violation of its contractual duties and the alleged fraud by its two

officers. *See IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 220 N.E.3d 646, 657 (N.Y. 2023) ("Where

the only damages alleged under either theory of recovery are identical for both claims, such

damages are within the contemplation of the parties under the contract and the non-contractual

claims must be dismissed as duplicative." (alterations adopted and internal quotation marks

omitted)); *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC*, 84 N.Y.S.3d 157, 161 (1st Dep't

2018) ("It has long been the rule that parties may not assert fraud claims seeking damages that are

duplicative of those recoverable on a cause of action for breach of contract."); *Gramercy Holdings

I, LLC v. Matec S.R.L.*, No. 20 Civ. 3937 (JPC), No. 20 Civ. 4136 (JPC), 2023 WL 5917624, at

*19 (S.D.N.Y. Sept. 11, 2023) (explaining that a fraud claim "can be dismissed as duplicative of

a breach of contract claim if it seeks the same damages" (quoting *Ambac Assurance Corp. v.

Countrywide Home Loans Inc.*, 118 N.Y.S.3d 13, 15 (1st Dep't 2020))).[6]

Finally, Bruwer and Metoyer's alleged misstatements were part and parcel of Bulson's

performance under the Agreement, not (as Ramus argues) collateral or extraneous to it.  *See*

---

[6] Although Ramus's fraud claim adds a general request for interest, attorneys' fees, costs, and punitive damages, none of those forms of relief are indicative of a separate injury traceable to the alleged fraud. *See MBIA Ins. Corp.*, 84 N.Y.S.3d at 161 ("[T]hat a different measure of interest might apply to a judgment related to a fraud, as opposed to a contract claim, is irrelevant, as interest is not an element of compensatory damages either in contract or in fraud.  Nor does [the plaintiff's] request for punitive damages change the result.  A party cannot bootstrap a fraud claim seeking duplicative relief merely by alleging a potential for punitive damages."); *Quanzhou Joerga Fashion Co., Ltd. v. Brooks Fitch Apparel Grp., LLC*, No. 10 Civ. 9078 (VM) (MHD), 2011 WL 4063344, at *9 (S.D.N.Y. Aug. 11, 2011) (rejecting a plaintiff's reliance on attorneys' fees and expenses as a basis for differentiating a fraud claim from a contract claim).

Opposition at 9-10.  As noted, the Agreement required Bulson to pay its subcontractors and suppliers and to provide Ramus with accurate statements of the project's expenses in order to receive progress payments under the contract.  *See* Agreement §§ 12.2.1, 12.4.2.  The Agreement specifically required Bulson to do so by submitting AFPs and partial lien waivers that, among things, accurately listed Bulson's expenses and represented the company's compliance with its contractual payment obligations.  *See id.* §§ 4.1, 12.2.2.  Thus, far from being collateral or extraneous to the Agreement, Bruwer's execution of AFP No. 8 in his capacity as Bulson's CEO and Metoyer's signing of the Partial Lien Waiver as Bulson's Comptroller, and the obligation under the Agreement that these documents contain accurate information as to Bulson's expenses and payments to its subcontractors, were the "very essence" of Bulson's performance of its contractual obligations.  *Sylhan, LLC v. Schwarzkopf Techs. Corp.*, No. 01 Civ. 4368 (JS), 2002 WL 32605796, at *5 (E.D.N.Y. Aug. 9, 2002) (rejecting a fraud claim based on a certification that allegedly misstated the purity of tungsten delivered pursuant to a contract).  Accordingly, the challenged representations in those documents were "intrinsic to [Bulson's] contractual obligations [under the Agreement] and cannot separately support a plausible fraud claim" against Bruwer and Metoyer.  *Revonate Mfg., LLC v. Acer Am. Corp.*, No. 12 Civ. 6017 (KBF), 2013 WL 342922, at *3 (S.D.N.Y. Jan. 18, 2013) (rejecting a fraud claim based on misrepresentations in periodic reports required to be made under a contract); *see Ho v. Star Contractors, Inc.*, 209 N.Y.S.3d 32, 34 (1st Dep't 2024) (holding that statements by a construction company "falsely misrepresent[ing] certain work to have been performed when it actually was not" were "not collateral to the contract and did not induce the contract, but simply constituted alleged misstatements about the work contemplated under the contract"); *Inspirit Dev. & Constr., LLC v. GMF 157 LP*, 164 N.Y.S.3d 575, 578 (1st Dep't 2022) (affirming the dismissal of a fraud claim

where "[t]he invoices and certifications on which [the] fraud claim [was] based were clearly contemplated by the contract").[7]

For these reasons, the Court holds that, on balance, Bruwer and Metoyer's alleged fraud is not sufficiently distinct from any alleged breach by Bulson of its contractual obligations under the Agreement. Accordingly, the Court dismisses the fraud claim in the Second Cause of Action. *See 110 E. 138 Realty LLC v. Rydan Realty, Inc.*, 179 N.Y.S.3d 15, 18 (1st Dep't 2022) ("The fraud cause of action fails as duplicative of the contract claim, as it is based on the same facts that underlie the contract cause of action, is not collateral to the contract, and does not seek damages that would be unrecoverable under a contract measure of damages.").

## B.  Breach of Fiduciary Duty (New York Lien Law)

Ramus next asserts a claim against Bruwer and Metoyer for diversion of trust funds under Article 3-A of the Lien Law, which the Complaint characterizes as a claim for breach of fiduciary duty. Compl. ¶ 140; Opposition at 11. Bruwer and Metoyer raise three grounds for dismissal of

---

[7] Ramus argues in passing that even if Bruwer and Metoyer's fraud was not collateral to the Agreement, his fraud claim survives because the Partial Lien Waiver refers to an "independent duty" under the Lien Law. *See* Opposition at 10. But courts have noted that under New York law, "even if a party sufficiently alleges a duty independent of the contract, the fraud claim is 'redundant' of the 'breach of contract claim' where 'it also seeks the same damages.'" *6340 NB LLC v. Cap. One N.A.*, No. 20 Civ. 2500 (OEM), 2024 WL 4100184, at *9 (E.D.N.Y. Sept. 5, 2024) (quoting *Chowaiki & Co. Fine Art Ltd. v. Lacher*, 982 N.Y.S.2d 474, 475 (1st Dep't 2014)); *see Empire Outlet Builders LLC v. Constr. Res. Corp. of N.Y.*, 97 N.Y.S.3d 68, 69 (1st Dep't 2019) ("Regardless of whether plaintiff sufficiently alleged breach of a duty independent of the [contract], the fraud claim is duplicative because plaintiff will be fully compensated via the contract claim."). As discussed, Ramus seeks the same measure of compensatory damages through his fraud claim that would be available in a breach of contract suit against Bulson and does not allege facts indicating that the injury he suffered as a result of Bruwer and Metoyer's alleged fraud is otherwise meaningfully distinct from Bulson's breach of the Agreement. *See IKB Int'l*, 220 N.E.3d at 657. New York courts have held that the failure to allege a distinct injury or damages attributable to the fraud is an "independent reason" for dismissing such a claim. *Mañas v. VMS Assocs., LLC*, 863 N.Y.S.2d 4, 7 (1st Dep't 2008); *see Fin. Guar. Ins. Co. v. Morgan Stanley ABS Cap. I Inc.*, 84 N.Y.S.3d 163, 165 (1st Dep't 2018) ("An action for fraud may be dismissed where the damages sought are duplicative of the damages sought for breach of contract.").

this claim, arguing that: (1) Ramus, as a homeowner, is not a beneficiary of the statutory trust created under Article 3-A; (2) any claim under Article 3-A would only be viable against Bulson, the statutory trustee; and (3) Ramus fails to plead his diversion claim with particularity under Federal Rule of Civil Procedure 9(b).  Motion at 7-8; Reply at 4-5.  For the following reasons, the Court holds that none of these arguments presents a basis for dismissing Ramus's diversion claim.

### 1. Homeowners Can Be Beneficiaries Under Article 3-A.

The Court begins by addressing whether Ramus has the capacity to sue for a diversion of trust assets under Article 3-A of the Lien Law.  That requires considering whether a homeowner can qualify as a beneficiary of a trust of which the contractor is the trustee under Article 3-A.

In a nutshell, "Article 3-A creates a trust as soon as a home improvement contractor receives funds for the improvement of residential real property."  *In re Henderson*, 423 B.R. 598, 623 (N.D.N.Y. Bankr. 2010); *see* N.Y. Lien Law § 70(1)-(2).  The contractor, as the statutory trustee, must hold and apply those funds for expenditures arising out of the construction project.  *See* N.Y. Lien Law § 71(2).  For example, one common type of expenditure for which a contractor is authorized to expend trust funds is the "payment of claims of subcontractors, architects, engineers, surveyors, laborers and materialmen."  *Id.* § 71(2)(a).  The statute further provides that "[a]ny transaction by which any trust asset is paid, transferred or applied for any purpose other than a purpose of the trust as stated in [N.Y. Lien Law § 71(1)-(2)], before payment or discharge of all trust claims with respect to the trust, is a diversion of trust assets."  *Id.* § 72(1).  And to ensure that trust funds are applied towards appropriate ends, the statute provides that a voluntary diversion of trust assets by the trustee is a "breach of trust," *id.*, which can give rise to a civil enforcement action by the beneficiaries of the trust, *id.* § 77(1).  Thus, the primary purpose of Article 3-A is "to protect subcontractors, tax collectors, and parties who expend labor or extend financing in construction projects, by impressing with a trust any funds paid to a contractor or received by an

owner in connection with an improvement of real property in the state." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 695 (2d Cir. 2010) (citing *Aspro Mech. Contracting, Inc. v. Fleet Bank, N.A.*, 805 N.E.2d 1037, 1039 (N.Y. 2004); *LeChase Data/Telecom Servs., LLC v. Goebert*, 844 N.E.2d 771, 776 (N.Y. 2006)).

Bruwer and Metoyer maintain that Ramus, as the owner of premises being renovated, is not himself a beneficiary of the funds he paid to Bulson in trust and therefore lacks the capacity to sue under the Lien Law. Motion at 7-8. In Bruwer and Metoyer's view, "the beneficiaries under N.Y. Lien Law are [Bulson's] subcontractors, not Ramus." *Id.* at 8.

Courts are divided as to whether a property owner in Ramus's position is a beneficiary of the Article 3-A trust and thus can assert a claim for diversion of trust assets.[8] Judges of the Appellate Division of the New York Supreme Court, of the New York Supreme Court itself, and of the Bankruptcy Court for the Southern District of New York have reached different results. *Compare Ippolito v. TJC Dev., LLC*, 920 N.Y.S.2d 108, 115 (2d Dep't 2011) (holding that "as a general matter, [the provisions of the Lien Law] enable the plaintiffs, as owners, to assert a cause of action pursuant to Lien Law article 3-A" for diversion of trust assets), *with Ho*, 209 N.Y.S.3d at 33 ("Plaintiffs failed to state a claim for breach of fiduciary duty against defendant contractor and its individual principals because, as the homeowners, plaintiffs lack standing under article 3-A of the Lien Law to assert a cause of action for breach of fiduciary duty against a contractor."); *compare 610 Park 8E LLC v. Best & Co., Inc.*, 111 N.Y.S.3d 807, 2018 WL 6424056, at *1 (N.Y. Sup. Ct. 2018) (holding that "the homeowner is a beneficiary of any such trust created [under the

---

[8] The parties and much of the case law refers to this issue as a question of "standing." The Court does not take this to mean that Ramus's ability to sue under the Lien Law implicates the Court's Article III subject matter jurisdiction. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014) (explaining that "statutory standing" is a merits issue of whether the plaintiff "has a cause of action under the statute").

Lien Law] and has [statutory] standing to maintain suit to enforce the trust fund provisions of Lien Law article 3-A"), *and Jorge v. Piola Prop. Mgmt. LLC*, 63 N.Y.S.3d 305, 2017 WL 2723466, at *3 (N.Y. Sup. Ct. 2017) (holding that "a homeowner has [statutory] standing to sue as a trust beneficiary under" Article 3-A), *with Broadway Houston Mack Dev. LLC v. Kohl*, 870 N.Y.S.2d 748, 756 (N.Y. Sup. Ct. 2008) ("[T]he Lien Law fiduciary duty is created by statute and may only be asserted by the beneficiary of a trust. Since the owner is not the beneficiary of the trust, it lacks [statutory] standing to interpose a cause of action for breach of fiduciary duty."), *and SP 101 W 15 LLC v. Powerone Elec. Contracting, Inc.*, No. 652625/13, 2014 WL 2215918, at *2 (N.Y. Sup. Ct. May 23, 2014) (holding that "an owner is not a beneficiary" under the Lien Law and therefore "lacks [statutory] standing to maintain an unlawful diversion of trust funds claim under Article 3-A"); *compare In re Salman*, No. 14-22017 (RDD), 2016 WL 11728990, at *5 (S.D.N.Y. Bankr. Nov. 7, 2016) ("Mr. Havens [] qualifies as a beneficiary [of the Article 3-A trust] as he is the owner of the property where the house was to be constructed."), *with In re JMK Constr. Grp., Ltd.*, 502 B.R. 396, 411 (S.D.N.Y. Bankr. 2013) ("QBPL, as project owner, is not a beneficiary of the trust and therefore lacks [statutory] standing to bring an action for the return of trust funds.").[9]

For its part, this Court does not profess to have any special insight into the nuances of the Lien Law. But for a couple of reasons, the Court finds more persuasive the view that homeowners

---

[9] Some of these diverging outcomes may be attributable to the distinction between homeowners—who, as the Court will explain, retain a property interest in advances made to contractors pursuant to a home improvement contract—and other types of property owners who are not trust beneficiaries under Article 3-A. *See, e.g.*, *514 West 24th Owner LLC v. Pryor*, No. 654827/2018, 2019 WL 2027587, at *3 (N.Y. Sup. Ct. May 8, 2019); *Jsignal LLC v. Artisan Constr. Partners LLC*, No. 654768/2016, 2017 WL 2671005, at *3 & n.6 (N.Y. Sup. Ct. June 21, 2017); *Select Constr. Corp. v. 502 Old Country Rd. LLC*, 819 N.Y.S.2d 851, 2006 WL 948127, at *2 (N.Y. Sup. Ct. 2006). *But see Ho*, 209 N.Y.S.3d at 33.

like Ramus do, in certain circumstances, have the capacity to sue for a contractor-trustee's diversion of trust assets under Article 3-A.

The Court begins with the text of the Lien Law.  Section 77 of the statute provides that "[a] trust arising under [Article 3-A] may be enforced by the holder of *any* trust claim."  N.Y. Lien Law § 77(1) (emphasis added).  And Section 71 states that, "[w]ith respect to the trusts of which a contractor or subcontractor is trustee, 'trust claims' means claims arising at any time for payments for which the trustee is authorized to use trust funds as provided in [Lien Law Section 71(2)]."  *Id.* § 71(3)(b).  In turn, Section 71(2) enumerates six purposes for which a contractor may use trust funds consistent with its role as trustee.  *See id.* § 71(2).  The last category of expenditures in that list is for any "payment to which the owner is entitled pursuant to the provisions of [Lien Law Section 71-a]."  *Id.* § 71(2)(f).

Accordingly, the key to whether a property owner has the capacity to sue under the Lien Law is whether the owner holds a claim for payment of trust funds under Section 71-a.  As relevant here, Section 71-a(4)(a) provides that "[u]nder a home improvement contract, payments received from an owner by a home improvement contractor prior to the substantial completion of work under the contract shall be deposited within five business days thereafter by the recipient in an escrow account in a bank, trust company, savings bank, or state or federal savings and loan association, located in this state."  *Id.* § 71-a(4)(a).  Section 71-a(4)(d) states that "[s]uch deposit or deposits shall remain the property of the owner" until any of three events occurs: (1) the contractor applies the deposits "to the purposes of the home improvement contract under the schedule of payments provided therein"; (2) the homeowner defaults or breaches in a manner "excusing the recipient's performance of the terms of the home improvement contract"; or (3) the contractor substantially performs the contract.  *Id.* § 71-a(4)(d).  Thus, "[a]n owner who makes an

advance on a home improvement contract" can fall within "the definition of trust fund beneficiary" under Article 3-A.  8 Warren's Weed New York Real Property § 92.70 (citing N.Y. Lien Law § 71-a(4)(a)); *see also Tutor Perini Bldg. Corp. v. N.Y.C. Reg'l Ctr., LLC* ("*Tutor Perini*"), 525 F. Supp. 3d 482, 504 (S.D.N.Y. 2021) ("The Lien Law recognizes three types of entities, each of which may become a trustee or beneficiary of Article 3-A trust assets: owners, contractors, and subcontractors.").

The Lien Law provides that "every trust claim shall be deemed to be in existence from the time of the making of the contract or the occurrence of the transaction out of which the claim arises."  N.Y. Lien Law § 71(5).  But although Section 71-a(4) makes clear that funds advanced pursuant to a home improvement contract remain the property of the homeowner until any of the events specified in Section 71-a(4)(d) occur, the Lien Law does not specify exactly when or how the owner would become "entitled" to a payment of such funds for purposes of when their trust claim arises.  *Id.* § 71(2)(f).  Courts have recognized, however, that homeowners retain a viable trust claim—if not from the moment the advance is made—at least when the contractor breaches or repudiates the home improvement contract and has either failed to apply certain trust assets toward one of the purposes enumerated in Section 71(2) or has misappropriated or diverted the funds instead.  *See Ippolito*, 920 N.Y.S.2d at 116 (holding that the homeowners had a valid trust claim where the contractor breached the contract, failed to apply the trust funds toward proper purposes, and misappropriated the funds); *People v. Hollowell,* 565 N.Y.S.2d 349, 350 (4th Dep't 1990) (holding that a homeowner had a valid trust claim where the contractor repudiated the contract, misappropriated the trust funds, and failed to apply the funds toward the improvement project); *Stern v. H. Dimarzo, Inc.*, 867 N.Y.S.2d 20, 2008 WL 2369749, at *17 (N.Y. Sup. Ct. 2008) (holding that the homeowners had a valid trust claim where the contractor breached the

contract, failed to apply a portion of the trust assets toward a proper purposes, and misappropriated the funds for use on unrelated projects); *In re Salman*, 2016 WL 11728990, at *5 (holding that a homeowner had a valid trust claim where the contractor failed to pay its subcontractor in full and misappropriated the funds instead).  Recognizing that a homeowner retains a trust claim under these circumstances makes sense:  following a material breach of the contract directing how the trust assets were otherwise to be used and a failure to properly apply the funds belonging to the homeowner, the owner's enduring property interest gives rise to a legal entitlement to seek a return of the remaining misapplied or unapplied funds.[10]

The drafting history of Article 3-A lends additional support to the conclusion that the statute provides homeowners a cause of action for diversion of funds advanced in connection with a home improvement contract.  The overarching purpose of Article 3-A, of course, is to ensure that subcontractors and the like are properly compensated for their work.  *See Aspro Mech. Contracting*, 805 N.E.2d at 1039.  Indeed, "[p]rior to 1988, owners were not included as beneficiaries of trust funds under the Lien Law and, therefore, did not have a trust claim."  *Stern*, 2008 WL 2369749, at *17 (citing *Hollowell*, 565 N.Y.S.2d at 350).  But in 1987, the state legislature amended the Lien Law to make clear that the statute applies to home improvement contracts and added Sections 71(2)(f) and 71-a(4) to Article 3-A.  *See* 1987 N.Y. Sess. Law Serv.

---

[10] Because the parties do not separately address whether, assuming that homeowners can qualify as Article 3-A beneficiaries at all, Ramus retained a valid trust claim, the Court need not decide whether there are other circumstances in which an owner could become entitled to payment under Section 71-a(4) or, indeed, whether an owner's entitlement to payment under the statute requires any additional circumstances beyond his initial advance of project funds.  *Cf. In re Salman*, 2016 WL 11728990, at *6 ("[T]he fiduciary relationship under Article 3-A exists prior to and independently of the wrongful conduct because the trustee's duties begin as soon as he receives the funds for the improvement of real property.").  The Court also does not address issues of priority between the homeowner and other potential beneficiaries, such as subcontractors, that may retain a valid trust claim as well.

421 §§ 3-5 (McKinney).  In adding both provisions to the statute simultaneously, the legislature likely intended to extend "'trust claims' . . . to include claims of owners to funds advanced by them to contractors for the construction of home improvements."  *Stern*, 2008 WL 2369749, at *18 (quoting *Hollowell*, 565 N.Y.S.2d at 350); *see Rogers v. State*, 694 N.Y.S.2d 874, 877-78 (N.Y. Ct. Cl. 1999), *aff'd*, 719 N.Y.S.2d 916 (4th Dep't 2001) (rejecting the argument that homeowners cannot qualify as beneficiaries under the Lien Law because although that "was the law at one time," "amendments extending the benefits of article 3-A to owners and including special requirements for deposits on home improvement contracts were enacted in 1987").  The very purpose of those amendments, after all, was to "protect consumers who contract for home improvements."  *Hollowell*, 565 N.Y.S.2d at 350; *see also Ippolito*, 920 N.Y.S.2d at 116 (observing that the history of the 1987 amendments "is replete with references to the fact that the purpose of the relevant amendments was to protect consumers and homeowners").

Affording homeowners a cause of action for diversion of trust funds against the home improvement contractor—funds that, by default, remain the homeowner's own property while held in escrow—therefore affords due respect to the purpose and function of the 1987 amendments. Indeed, homeowners may in many instances be better positioned than individual subcontractors to monitor the general contractor's use of project funds and to ensure that those funds are being applied towards proper purposes.  Allowing homeowners to assert a claim for diversion therefore also furthers Article 3-A's purpose of protecting those who perform work on home improvement projects at the direction of the general contractor.

Under this interpretation, Ramus plausibly alleges a basis to assert a cause of action for diversion of trust assets under Article 3-A.  There is no dispute that the Complaint alleges that Ramus is a homeowner, that Bulson acted in its capacity as a home improvement contractor, and

that Ramus advanced the project funds to Bulson in connection with their home improvement contract. Compl. ¶¶ 6-9, 37-40. And according to the Complaint, Ramus paid Bulson $972,202.97 over the course of the project, with all payments becoming assets of a statutory trust under Article 3-A at the time the payments were made. *Id.* ¶¶ 38-40. Ramus alleges that as of the filing of this action, a portion of the funds he paid to Bulson had not been applied toward any of the six categories of expenses provided in Lien Law Section 71(2), that Bruwer and Metoyer diverted the funds instead, and that the project was abandoned. *Id.* ¶¶ 65-111. The Complaint further alleges that Ramus complied with his payment obligations under the Agreement prior to Bulson's abandonment of the project, *id.* ¶¶ 37-40, and that Bulson failed to substantially perform the contract, *id.* ¶¶ 41-56, 115. Under Section 71-a(4), Ramus therefore remained the owner of the allegedly unapplied funds paid to Bulson and retained a trust claim sufficient to sue for diversion.

### 2. Under Article 3-A, Officers of a Corporate Trustee Can Be Individually Liable for Participating in the Trustee's Diversion of Trust Assets.

Bruwer and Metoyer next argue that even if Ramus, as a homeowner, may bring an action under Article 3-A, his only viable claim for diversion would be against Bulson, the statutory trustee, not Bruwer and Metoyer individually. Motion at 8. And in their view, "there is no fiduciary relationship between Ramus and [themselves]." *Id.* The Court disagrees that Ramus's only viable claim for diversion is against Bulson itself.

New York courts are in broad agreement that "the individual officers of a corporate trustee may be held personally liable pursuant to Lien Law article 3-A for knowingly participating in a diversion of trust assets." *Holt Constr. Corp. v. Grand Palais, LLC*, 969 N.Y.S.2d 499, 503 (2d Dep't 2013); *see In re Lehr Constr. Corp.*, No. 11-10723 (SHL), 2015 WL 5174467, at *8 (S.D.N.Y. Bankr. Sept. 2, 2015) ("A trust beneficiary has a cause of action personally against

principals of an Article 3-A trustee company for the improper diversion of Article 3-A trust funds." (citing *Ippolito*, 920 N.Y.S.2d at 118)); *In re Salman*, 2016 WL 11728990, at *6 (similar).

On the other hand, it is less than clear whether Bruwer and Metoyer's individual duty to Ramus "not to cause [Bulson] to misappropriate trust property" is itself fiduciary in nature. *Atlas Bldg. Sys., Inc. v. Rende*, 653 N.Y.S.2d 694, 695 (2d Dep't 1997). While some courts have described the nature of that duty in terms of a fiduciary obligation on the part of the trustee's principals and managing officers, others have justified imposing the duty by way of reference to the law of conversion. *Compare, e.g.*, *Holt Constr. Corp.*, 969 N.Y.S.2d at 503 (characterizing an officer's violation of Article 3-A as the "fail[ure] to hold the [funds] in trust to pay for the cost of improvements"), *with Ippolito*, 920 N.Y.S.2d at 118 (relying on conversion law principles to hold officers of the trustee liable for diversion). And in the bankruptcy context, several courts have held that the managing officers of a corporate trustee at least "act[] in a fiduciary capacity with respect to the trust beneficiaries" when administering the Article 3-A trust. *In re Salman*, 2016 WL 11728990, at *6; *see also In re Kofsky*, 351 B.R. 123, 129 (S.D.N.Y. Bankr. 2006) ("[A] managing officer of a corporation that has received funds subject to Article 3A of the Lien Law could have no doubt that he was potentially a fiduciary with respect to such funds and personally liable for their misappropriation."); *In re Polidoro*, 12 B.R. 867, 871 (E.D.N.Y. Bankr. 1981) ("Since the New York courts have made the liability of managing officers coextensive with that of the corporate contractor, . . . the conclusion is inescapable that the debtor herein was a fiduciary prior to his corporation's misapplication of trust funds.").

The Court does not need to decide whether "breach of fiduciary duty" is the most accurate label for Ramus's claim for diversion. As courts have recognized, the precise "basis for [individual] liability [under Article 3-A] does not appear very important under state law." *In re*

*Kofsky*, 351 B.R. at 128. And as noted, Ramus ultimately characterizes his fiduciary duty claim as one for the diversion of trust assets under Article 3-A, Opposition at 11-13; Surreply at 1, so the Court will construe the claim as such. *Cf. Jara v. Strong Steel Door, Inc.*, 872 N.Y.S.2d 691, 2008 WL 3823769, at *11 (N.Y. Sup. Ct. 2008) (dismissing a separate cause of action for breach of fiduciary duty as duplicative of an underlying claim for diversion under the Lien Law).

Under that approach, Ramus's diversion claim cannot be dismissed on the ground that Bruwer and Metoyer were merely officers of the statutory trustee, Bulson. Here, Bruwer and Metoyer, who allegedly were Bulson's Chief Executive Officer and Comptroller, respectively, do not argue that the Complaint fails to adequately allege their knowledge of or involvement in the voluntary diversion of funds held in trust by Bulson, but rather that Article 3-A categorically bars diversion claims against the officers of a trustee. Because New York courts have recognized a cause of action against the officers of the statutory trustee in those circumstances, the Court declines to dismiss Ramus's diversion claim on the ground that Bulson was the statutory trustee.

### 3. Ramus's Diversion Claim Cannot Be Dismissed for Failure to Plead with Particularity.

Finally, Bruwer and Metoyer contend that Ramus fails to plead this claim with particularity under Rule 9(b). Reply at 4-5. As they point out, "[c]laims sounding in fraud must satisfy the heightened pleading standards of Federal Rule of Civil Procedure Rule 9(b)." *Olson v. Major League Baseball*, 29 F.4th 59, 71 (2d Cir. 2022); *see* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "Rule 9(b) applies to all allegations of fraud and to all claims that sound in fraud, as determined by the wording and imputations of the complaint, regardless of the labels used in the pleading." *Barnet v. Drawbridge Special Opportunities Fund LP*, No. 14 Civ. 1376 (PKC), 2014 WL 4393320, at *11 (S.D.N.Y. Sept. 5, 2014). When Rule 9(b) applies, "the plaintiff must (1) detail

24

the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Olson*, 29 F.4th at 71 (internal quotation marks omitted).

As noted, however, Ramus characterizes his Third Cause of Action as a claim arising from the diversion of trust assets under Article 3-A of the Lien Law, and the Court construes it as such. *See* Compl. ¶¶ 140-141 (alleging that Bruwer and Metoyer breached their fiduciary duty under the Lien Law by diverting trust assets); Opposition at 11-13 (characterizing the claim as one based on diversion under the Lien Law); Surreply at 1 (same). So understood, the claim does not depend on allegations of fraudulent conduct, and fraud is neither integral nor essential to the claim. *See Hauptman v. Interactive Brokers, LLC*, No. 17 Civ. 9382 (GBD), 2018 WL 4278345, at *6 (S.D.N.Y. June 12, 2018). That is because a diversion giving rise to a breach of trust under Article 3-A requires only that the trustee—through a "voluntary act" and "before payment or discharge of all trust claims"—pay, transfer, or apply trust assets for any purpose other than those specified in Section 71(1)-(2). N.Y. Lien Law § 72(1); *see Interworks Sys.*, 604 F.3d at 695 ("Until all trust fund beneficiaries have been satisfied, it is an unlawful diversion of trust fund assets for the contractor or owner to use any of the trust fund assets for any purpose other than satisfying the claims of beneficiaries."). Accordingly, Ramus's claim for diversion is not subject to Rule 9(b) and cannot be dismissed for failure to plead with particularity.[11]

---

[11] Insofar as the alleged diversion references underlying allegations of fraudulent conduct, the claim complies with Rule 9(b) to the extent that it is based on alleged misstatements contained in AFP No. 8 and the Partial Lien Waiver concerning Bulson's payments to its subcontractors and suppliers and its expenditures. *See* Compl. ¶ 141 (alleging that Bruwer and Metoyer's diversion of trust assets involved them "making numerous misrepresentations to [Ramus] in connection with the status of the Project and payments due in connection therewith"). With respect to these documents, Ramus reproduces the challenged statements verbatim. *Id.* ¶ 65, Exhs. B, C. Ramus also identifies the speakers. *Id.* ¶ 65. And he states exactly when and where the statements were

* * *

For these reasons, the Court declines to dismiss Ramus's diversion claim on the grounds that Ramus lacks the capacity as a homeowner to bring such a claim under the Lien Law, can only assert the claim against Bulson itself, or fails to plead the claim with particularity. Because Bruwer and Metoyer present no other arguments against this claim, the Court denies their request to dismiss the Third Cause of Action.

## C.    Unjust Enrichment

Bruwer and Metoyer also move to dismiss Ramus's Fourth Cause of Action for unjust enrichment. Motion at 9-10. "To establish unjust enrichment, the plaintiff must show (1) the other party was enriched, (2) at the other party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 473 (S.D.N.Y. 2020) (internal quotation marks omitted).

In this case, however, Ramus's unjust enrichment claim seeks to recover exactly the same damages as his claim for diversion of trust assets and is based on the same set of facts as his other claims. Compl. ¶¶ 139-149; *id.* at 27-28. Accordingly, the Court dismisses the unjust enrichment claim as duplicative of Ramus's other causes of action. *See Carovillano v. Sirius XM Radio Inc.*, 715 F. Supp. 3d 562, 586 (S.D.N.Y. 2024) ("Where an unjust enrichment claim is premised on the same factual allegations as those supporting a plaintiff's other claims, and a plaintiff has not alleged distinct damages with respect to this claim, an unjust enrichment claim will be dismissed." (alterations adopted and internal quotation marks omitted)).

---

made. *Id.*, Exhs. B, C. Finally, Ramus alleges that the statements in those documents concerning Bulson's compliance with its payment obligations were false because, in reality, Bulson had not fully paid its subcontractors and suppliers and had misstated certain of its expenditures. *Id.* ¶¶ 65-111.

### D.    Constructive Trust

Ramus's Fifth Cause of Action asserts a claim for a constructive trust.  Compl. ¶¶ 150-156.
It is often said that "New York law generally requires four elements for a constructive trust: (1) a
confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject
*res* made in reliance on that promise; and (4) unjust enrichment."  *In re First Cent. Fin. Corp.*,
377 F.3d 209, 212 (2d Cir. 2004) (internal quotation marks omitted).   Courts have stressed,
however, that "the constructive trust doctrine is equitable in nature and should not be rigidly
limited."  *Barron v. Helbiz Inc.*, No. 20 Civ. 4703 (LLS), 2023 WL 5672640, at *12 (S.D.N.Y.
Sept. 1, 2023) (quoting *In re Koreag, Controle et Revision S.A.* ("*In re Koreag*"), 961 F.2d 341,
352 (2d Cir. 1992)).  Instead, a "constructive trust will be erected whenever necessary to satisfy
the demands of justice" and "its applicability is limited only by the inventiveness of men who find
new ways to enrich themselves unjustly by grasping what should not belong to them."  *Simonds v.
Simonds*, 380 N.E.2d 189, 194 (N.Y. 1978) (alteration adopted and internal quotation marks
omitted); *see also City of Almaty v. Ablyazov*, No. 15 Civ. 5345 (JGK), 2023 WL 4863142, at *28
(S.D.N.Y. July 31, 2023) ("A constructive trust [] 'is the formula through which the conscience of
equity finds expression.'" (quoting *Simonds*, 380 N.E.2d at 193)).  Thus, "New York courts have
at times dispensed with one or more of [the four] requirements" in considering whether to impose
a constructive trust.  *Barron*, 2023 WL 5672640, at *12.

Here, the sole argument that Bruwer and Metoyer present in support of their request to
dismiss Ramus's constructive trust claim is that they did not personally owe him a fiduciary duty.
Motion at 10.  As discussed above, it is not immediately clear whether Ramus's Third Cause of
Action—which Ramus characterizes (and the Court construes) as a claim for diversion of trust

assets under Article 3-A—is best understood as involving a distinct breach of *fiduciary* duty by Bruwer and Metoyer.

The Second Circuit, however, has held that "the lack of a fiduciary relationship does not defeat the imposition of a constructive trust." *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 362 (2d Cir. 1999); *see also In re Koreag*, 961 F.2d at 353 ("Although a fiduciary relationship is one of the factors cited by New York courts, the absence of any one factor will not itself defeat the imposition of a constructive trust when otherwise required by equity.").  Thus, the Court perceives no reason at this stage why the availability of a constructive trust, a flexible remedy rooted in equity, should turn on whether the duty that Bruwer and Metoyer owed to Ramus to avoid participating in a diversion of trust assets is best labeled as a fiduciary one.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2015 WL 4634541, at *99 (S.D.N.Y. Aug. 4, 2015) ("Whether a counterparty unjustly retained money that should have been paid or received money that [it] should not have, equity may impose a constructive trust.").  Because Ramus may ultimately be able to demonstrate that it would be appropriate to impose a constructive trust under the circumstances alleged in the Complaint, the Court declines to dismiss this claim based solely on the purported absence of a fiduciary relationship between the parties.[12]

The Court observes, however, that whether to allow the constructive trust claim at this stage in the case is "entirely semantic."  *Winklevoss Cap. Fund, LLC v. Shrem* ("*Winklevoss*"), 351 F. Supp. 3d 710, 721 (S.D.N.Y. 2019).  That is so because regardless of whether or not the claim survives dismissal, Ramus "may, if appropriate, later request, as a remedy, the imposition

---

[12] As noted, Bruwer and Metoyer only move to dismiss Ramus's constructive trust claim on the ground that there was no fiduciary relationship between the parties.  Thus, the Court need not (and does not) decide at this stage whether a constructive trust would otherwise be available and appropriate under New York law.

of a constructive trust." *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 420 (S.D.N.Y. 2010); *see also DarkPulse, Inc. v. EMA Fin., LLC*, No. 22 Civ. 45 (LGS), 2023 WL 2307386, at *8 (S.D.N.Y. Mar. 1, 2023) (explaining that the dismissal of a constructive trust claim at the pleading stage "is largely a technicality, because [a plaintiff] may seek imposition of a constructive trust as an equitable remedy"). Indeed, it is not exactly clear whether a request for a constructive trust can stand as a distinct cause of action at all. *See Winklevoss*, 351 F. Supp. 3d at 721.

Accordingly, Bruwer and Metoyer's request to dismiss Ramus's claim for a constructive trust is denied, but that disposition should have little or no practical effect on this case.

### E.    Inspection of Books and Records

Ramus additionally brings a claim in the First Cause of Action to inspect the books and records that Bulson kept in its capacity as a trustee under the Lien Law. Compl. ¶¶ 120-128. Under Section 76 of the Lien Law,

> [a]ny beneficiary of the trust holding a trust claim shall be entitled, upon request, after the expiration of thirty days from the date his trust claim became payable, and thereafter not oftener than once in each month, (a) to examine the books or records of the trustee with respect to the trust, and to make copies of any part or parts thereof relating to the trust; or (b) at the beneficiary's option to receive a verified statement setting forth the entries with respect to the trust contained in such books or records.

N.Y. Lien Law § 76(1). The Lien Law further provides that "[i]f a trustee on whom a request for examination and copying or for a verified statement is served as provided in this section shall refuse to comply therewith or shall fail to comply therewith within ten days," the beneficiary may seek a court order "directing that the trustee comply with the request." *Id.* § 76(5).

Bruwer and Metoyer move to dismiss this claim on the ground that "Bulson is the trustee under the Lien Law, not the individual defendants." Motion at 8-9; *see also* Reply at 5 (arguing that the Lien Law's books and record provisions are "inapplicable because the individual defendants are not trustees under the Lien Law"). Bruwer and Metoyer, however, cite no authority

for the proposition that Ramus's books and records claim cannot be asserted against them individually.  And although Section 76(5) contemplates that an action brought by a beneficiary to enforce his right to inspect the trustee's books and records will be brought against the trustee itself, Section 76 also provides:

> This section does not limit the power of the court in an action pursuant to [Lien Law Section 77] or in any other action or proceeding affecting trust assets or involving trust claims or the administration of the trust, to give directions with respect to production or examination of any books or records of the trustee.

N.Y. Lien Law § 76(6).  The parties' briefing does not address the significance (if any) of Section 76(6) to Ramus's claim for inspection of books and records, including the proper procedural mechanism through which the Court would "give directions with respect to production or examination of any books or records of the trustee." *Id.*  Those questions, however, may ultimately prove to be academic because Bulson's books and records will in any event likely be subject to discovery under the Federal Rules of Civil Procedure given the survival of Ramus's claims for diversion under the Lien Law and a constructive trust.  But either way, in light of Section 76(6)'s facially broad sweep, the Court does not construe the statute to categorically prevent a court in an action such as this one from giving directions to an appropriate officer of a contractor-trustee regarding the trustee's books and records solely by virtue of the fact that the officer is not himself the trustee.  Whether such an order would ultimately be feasible and justified, however, is a question that the Court does not resolve at this stage.

Bruwer and Metoyer also argue that the books and records claim is moot because Bulson already turned over its books and records in the arbitration action.  Motion at 9; Reply at 5.  But the Complaint alleges that Bruwer and Metoyer "failed to produce the books and records relating to the trust funds for examination and copying, despite Plaintiff's request that they do so."  Compl. ¶ 127.  And Bruwer and Metoyer have not presented any evidence regarding whether and to what

extent they and Bulson have complied with their obligations under Section 76 in the later-filed arbitration action, such that the claim is now moot. Ramus, for his part, provides a declaration by his counsel asserting that while the parties "exchanged tens of thousands of pages of documents" in the arbitration action, "Bulson never produced the books and records in the very particular organizational format specified in New York Lien Law § 75 that would track, cent-for-cent, the trust funds and their expenditure, which was required to be produced pursuant to New York Lien Law § 76." Dkt. 50-1 ¶¶ 4-5. The present record is therefore insufficient to satisfy Bruwer and Metoyer's burden to show that this claim is moot. *See Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016).

Given that Bruwer and Metoyer have presented no other arguments for why Ramus's books and records claim cannot proceed at this stage, the Court declines to dismiss the claim.

## F.    Request to Stay

Finally, Bruwer and Metoyer request that the Court stay this action pending the outcome of the arbitration proceeding against Bulson. Motion at 10-11. As they correctly point out, the arbitration action "involves the same set of operative facts" as this case, "as well as claims that are substantially similar to those asserted herein" *Id.* at 10. Bruwer and Metoyer therefore argue that staying this case pending the arbitration would avoid duplicative litigation, promote judicial efficiency, and minimize the risk of conflicting decisions. *Id.* at 11.

A federal court may "grant a stay 'pursuant to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *Birmingham Assocs. Ltd. v. Abbott Lab'ys*, 547 F. Supp. 2d 295, 302 (S.D.N.Y. 2008) (quoting *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997)). "A party seeking a stay pending arbitration bears the burden of establishing that there are issues common to the

arbitration and the court, and that those issues will finally be determined by arbitration." *Champion Auto Sales, LLC v. Polaris Sales Inc.*, 943 F. Supp. 2d 346, 355 (E.D.N.Y. 2013) (internal quotation marks omitted). "If this test is met, the movant has the burden of showing that it will not hinder arbitration, that the arbitration will be resolved within a reasonable time, and that any delay that may occur will not cause undue hardship to the nonmoving party." *Birmingham Assocs.*, 547 F. Supp. 2d at 302. Stays pending arbitration "are particularly appropriate where they promote judicial economy, avoidance of confusion and possible inconsistent results." *Id.* (internal quotation marks omitted).

As noted, it is clear that the arbitration against Bulson involves issues common to this litigation. Thus, a stay of this action until the arbitration action is decided would normally make sense. The problem, however, is that Bruwer and Metoyer do not address whether the arbitration against Bulson will be resolved within a reasonable time or whether any delay that might occur in resolving the arbitration will prejudice Ramus. Indeed, the parties represent that the arbitration proceeding is itself stayed indefinitely pending Bulson's ongoing bankruptcy proceeding. Dkt. 50-1 ¶ 7; Opposition at 15-16; Reply at 7. It is therefore unclear when—if ever—the arbitration proceeding against Bulson will be resolved. As a result, Bruwer and Metoyer have failed to satisfy their burden of showing that a stay of the instant action would serve the ends of judicial efficiency and would not impose an undue hardship on Ramus. The Court accordingly denies Bruwer and Metoyer's request to stay this action without prejudice to them renewing the request in the future should the circumstances surrounding the arbitration change.

## IV.  Conclusion

For these reasons, the Court grants Bruwer and Metoyer's Motion in part and denies it in part, and denies their request to stay this case. Ramus's Second and Fourth Causes of Action—

for fraud and unjust enrichment—are dismissed, and his other causes of action survive dismissal. Because Ramus has not requested leave to amend or explained how he would seek to cure the deficiencies in the Second and Fourth Causes of Action identified herein, the Court does not *sua sponte* grant leave to amend. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [for leave to amend] that was not made.").

The parties are directed to appear for a status conference on April 2, 2025, at 3:00 p.m., in Courtroom 12D of the Daniel Patrick Moynihan U.S. Courthouse, 500 Pearl Street, New York, New York 10007. At the conference, the parties should be prepared to address whether this case must proceed as a representative action on behalf of all remaining beneficiaries to the Article 3-A trust identified in the Complaint and, if so, provide their views as to the appropriate procedural mechanism through which to implement that requirement. *See* N.Y. Lien Law § 77(1) ("A trust arising under [Article 3-A] may be enforced by the holder of any trust claim . . . in a representative action brought for the benefit of all beneficiaries of the trust."); *Tutor Perini*, 525 F. Supp. 3d at 501-04 ("[T]o ultimately secure relief on its Lien Law claim, [the plaintiff] must . . . either satisfy Rule 23 or join all beneficiaries.").

Bruwer and Metoyer's deadline to answer the Complaint is adjourned until further notice and will be discussed at the status conference on April 2, 2025. The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 48.

SO ORDERED.

Dated: March 17, 2025
New York, New York

JOHN P. CRONAN
United States District Judge