UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                         :

JOSHUA RAMUS,                         :

                   Plaintiff,          :

                -v-                  :          23 Civ. 1770 (JPC)

                                     :

GRAHAM R. BRUWER and GERARD E. METOYER,  :      OPINION AND ORDER

               Defendants.      :

                                           :
-----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

This is round two of motion-to-dismiss briefing in a dispute between Plaintiff Joshua Ramus, the owner of a New York City apartment, and Defendants Graham R. Bruwer and Gerard E. Metoyer, officers of Bulson Management, LLC ("Bulson"). Ramus engaged Bulson to serve as general contractor of his apartment's renovation, but Bulson abandoned the project and failed to make all of the required payments to its subcontractors and suppliers. Weeks after Bulson abandoned the project, Ramus brought this action against Bruwer and Metoyer—but not Bulson, which has since filed for bankruptcy—bringing claims of fraud, breach of fiduciary duty for diversion of trust funds under the New York Lien Law ("Lien Law"), unjust enrichment, and constructive trust. Ramus also sought to compel the production of Bulson's books and records on the renovation project. After Defendants moved to dismiss Ramus's original Complaint, this Court dismissed Ramus's fraud and unjust enrichment claims but declined to dismiss the others. *See Ramus v. Bruwer*, No. 23 Civ. 1770 (JPC), 2025 WL 831109, at \*15 (S.D.N.Y. Mar. 17, 2025). The Court then allowed Ramus to file an Amended Complaint rehabilitating his fraud claim and pleading "additional causes of action arising out of the parties' dispute if appropriate," and further

required Ramus's Lien Law claim to be "filed in a representative capacity on behalf of all beneficiaries of the trust."  Dkt. 62 at 2-3.

Ramus's Amended Complaint fails to properly bring a Lien Law claim as directed by this Court and also fails to state most other claims.  But there is an open question of whether—absent any other viable claims—Ramus can state claims for constructive trust and the production of books and records, and Defendants were unclear as to whether they were also moving to dismiss those claims.  So the Court grants Defendants' renewed motion to dismiss in relevant part and solicits further briefing on the continued viability of those remaining two claims.

## I.  Background

### A.    Facts[1]

The Court assumes general familiarity with the facts behind this case, which are largely consistent between the original Complaint and the Amended Complaint.  *See Ramus*, 2025 WL 831109, at *1-4.  For present purposes, the following suffices:

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from Ramus's Amended Complaint, Dkt. 63 ("Am. Compl."), and the exhibits attached to the Amended Complaint.  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor").  The Court also considers the American Institute of Architects Document A105-2017, Standard Short Form of Agreement Between Owner and Contractor, which was attached to the original Complaint, Dkt. 1, Exh. A ("Agreement"), and is either incorporated by reference in or integral to the Amended Complaint, *see, e.g.*, Am. Compl. ¶¶ 8, 14-15, 31, 34, 74, 130.  The Court trusts that Ramus's failure to attach the Agreement to the Amended Complaint was simply an oversight, rather than an attempt to avoid this Court's prior holding that Ramus's fraud claim "impermissibly seeks to recover in tort for Bulson's alleged breach of its contractual obligations under the Agreement."  *Ramus*, 2025 WL 831109, at *5-7; *see Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156-57 (2d Cir. 2006) (explaining that when material integral to a complaint, such as "a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, . . . for some reason— usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint[,]" a court may consider such material to

Bruwer was the founder, sole member, and Chief Executive Officer ("CEO") of Bulson, a construction company, while Metoyer was the company's Comptroller. Am. Compl. ¶¶ 6, 9-11. On August 6, 2020, Bulson entered into the Agreement with Ramus, the owner of a cooperative apartment in Manhattan, to completely renovate the apartment as general contractor (the "Project"). *Id.* ¶¶ 7-8. Bruwer signed the Agreement on Bulson's behalf as the company's CEO. *Id.* ¶ 10.

Under the Agreement, the Project was set to begin on August 17, 2020, with a substantial completion date of July 13, 2021. *Id.* ¶¶ 12, 14. The Agreement initially provided that the total cost of the Project would be $1,275,811.00, but that cost was revised upwards to $1,388,078.00 pursuant to various change orders. *Id.* ¶¶ 15-16.

The Agreement contemplated a schedule of periodic payments and specified how Bulson would be paid. *See* Agreement § 12. Under that system, Bulson was required to submit an Application for Payment for Work (an "AFP") to Ramus's architect at least ten days prior to the date set for each progress payment. *Id.* § 12.2.1. Each AFP was required to be "supported by data substantiating [Bulson's] right to payment as [Ramus or his architect] may reasonably require, such as evidence of payments made to, and waivers of liens from, subcontractors and suppliers." *Id.* The Agreement further provided that:

> [Bulson] warrants that title to all Work covered by an [AFP] will pass to [Ramus] no later than the time of payment. [Bulson] further warrants that upon submittal of an [AFP], all Work for which Certificates of Payment have been previously issued and payments received from [Ramus] shall, to the best of [Bulson's] knowledge, information, and belief, be free and clear of liens, claims, security interests, or other encumbrances adverse to [Ramus's] interests.

*Id.* § 12.2.2.

---

"prevent[] plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting").

Within seven days after receiving an AFP, Ramus's architect was required to either issue a certificate for payment in the full amount of the AFP, issue a certificate for payment in a different amount that the architect determined was properly due and notify Ramus and Bulson in writing of the reasons for the architect partly withholding certification, or withhold certification of the entire AFP and provide a statement of reasons for the architect's decision to withhold certification. *Id.* § 12.3. Once the architect issued a certificate for payment, Ramus was then required to pay the amount certified within five business days. *Id.* §§ 4.1, 12.4.1. It was Bulson's responsibility, however, to pay its subcontractors and suppliers, and under the Agreement it was obligated to "promptly" do so upon receiving the funds requested through its AFPs. *Id.* § 12.4.2; *see also id.* § 12.4.3 (providing that neither Ramus nor his architect "shall have responsibility for payments to a subcontractor or supplier").

The Agreement also required Bulson to execute a partial lien waiver in connection with each progress payment. *Id.* § 4.1. The template provided in the Agreement required Bulson to include in each partial lien waiver a representation and warranty that "all its subcontractors, all labor, materials, and equipment, including all social security taxes, withholding taxes, sales and use taxes, permits and workers compensation, union payments and insurance premiums in connection with performance of the [Agreement] have been fully paid and discharged for all work done and material[s] supplied to date." *Id.* The template also stated that "[Bulson] acknowledges that [Ramus] is relying upon the truth of the statements" in that representation. *Id.*

After beginning the Project, Bulson entered into subcontracts with various entities to perform certain work at the apartment. Am. Compl. ¶¶ 17-24. For instance, Bulson subcontracted with HVAC Performance LLC ("HVAC Subcontractor") to install heating and cooling equipment at the apartment, and with Sunny Electrical Contracting, Inc. ("Electrical Subcontractor") to do

electrical work there.  *Id.* ¶¶ 20-21.  As the Project progressed, Bulson issued AFPs and supporting

documents pursuant to the Agreement, "which itemized the payments to be paid [by Ramus] to

Bulson and the subcontractors for labor and materials."  *Id.* ¶ 27.  Upon receiving the

corresponding AFPs and partial lien waivers from Bulson, Ramus made payments to the company

as set forth in the following table:

| Date | Amount |
|---|---|
| November 26, 2019 | $19,159.50 |
| January 2, 2020 | $19,159.50 |
| February 28, 2020 | $10,410.60 |
| October 14, 2020 | $334,013.70 |
| February 25, 2021 | $123,181.87 |
| September 8, 2021 | $174,542.47 |
| November 9, 2021 | $82,611.05 |
| December 23, 2021 | $35,477.42 |
| February 7, 2022 | $65,134.87 |
| March 28, 2022 | $27,300.00 |
| April 18, 2022 | $40,342.00 |
| June 22, 2022 | $40,870.00 |

*Id.* ¶ 28.  In total, Ramus paid Bulson $972,202.97 over the course of the Project.  *Id.* ¶¶ 28-29.[2]

Ramus alleges that these payments became "assets of a trust of which [Ramus] is a beneficiary"

pursuant to Article 3-A of the Lien Law.  *Id.* ¶ 30.

---

[2] Although the twelve individual payments add up to $972,202.98, the Amended Complaint states that Ramus paid Bruwer a total of $972,202.97.  *Compare* Am. Compl. ¶ 28, *with id.* ¶ 29.

Ramus made the final payment listed in the chart above—for $40,870.00—pursuant to AFP No. 8 and a partial lien waiver dated June 24, 2022.  *See* Am. Compl., Exhs. A ("Partial Lien Waiver"), B ("AFP No. 8").[3]   AFP No. 8, which was signed by Bruwer on Bulson's behalf, contained the following representation:

> The undersigned Contractor [Bulson] certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts payments received from the Owner, and that current payment shown herein is now due[]have been paid by the Contractor for work for which previous Certificates for Payment were issued and that current payment shown herein is now due.

AFP No. 8 at 1.  AFP No. 8 listed the "current payment due" as $40,870.00 and noted that Ramus had already paid $931,332.98 pursuant to prior certificates for payment.  *Id.*  AFP No. 8 attached various spreadsheets, described different categories of work and supplies contemplated under the Agreement, and documented amounts associated with the scheduled and completed values of the work and supplies.  *See id.* at 2-4.

Metoyer signed the Partial Lien Waiver on Bulson's behalf.  Partial Lien Waiver at 2. Consistent with AFP No. 8, the Partial Lien Waiver stated that the current payment due from Ramus was $40,870.00 and noted that Bulson had previously received $931,332.98 from Ramus under the Agreement.  *Id.* at 1.  As required by the Agreement, the Partial Lien Waiver also contained the following representation:

> The Contractor [Bulson] certifies, warrants, and represents that: (a) upon receipt and collection of the Current Payment, it will be paid in accordance with all applicable Contract obligations for all work, labor, and services performed, and materials and equipment provided, with respect to the Project; (b) except for sums to be dispersed from the proceeds of the Current Payment, it owes no one for any labor, services, tools, equipment, materials, taxes, insurance premiums or any other item of cost or expense in connection with the performance or furnishing of the Work under the

---

[3] Although AFP No. 8 is associated with the final payment under the Agreement, that payment, as alleged, was the twelfth one that Ramus made.  *See* Am. Compl. ¶ 28.

6

Contract; and (c) no unresolved and outstanding claims have been made against the Contractor by any subcontractor or material supplier for any unpaid labor, services, materials, tools, equipment, or any other item of cost and expense arising out of or relating to the Work under the Contract that are not currently paid and satisfied.

*Id.* ¶ 2. Under the Partial Lien Waiver, Bulson "further warrant[ed] and represent[ed]" that the current payment due and the amount previously paid "are trust funds (as defined by the NY Lien Law) received for the purpose of paying all claims for labor and/or materials and [Bulson] will apply all payments received for said purpose before using any part thereof for any other purpose." *Id.* ¶ 3.

Despite Ramus's timely payments, the Project slowed down and then "stalled almost completely" by 2022. Am. Compl. ¶¶ 31, 36. Bruwer initially "blamed the slow progress of the Project on the COVID-19 pandemic, inflation and supply-chain issues." *Id.* ¶ 35; *see* Am. Compl., Exh. C at Bulson7161-Bulson7162 (9/21/2021 email from Bruwer to Ramus). After Ramus requested that he be provided with an updated schedule and definitive completion date—which Defendants would set for November 11, 2022—Bruwer then "claimed that [the] further delays were caused by disputes between Bulson and a subcontractor, who supposedly refused to honor the terms of its subcontract." Am. Compl. ¶¶ 37-40; *see* Am. Compl., Exh. D at Bulson7310-Bulson7311 (10/19/2022 email from Bruwer to Ramus). In light of that subcontractor's refusal, Bruwer indicated that the schedule would be delayed until March 2023. Am. Compl. ¶¶ 42-43. Then, in the fall of 2022, Ramus further "discovered that some of the work on the Project was not done pursuant to the drawings and specifications referenced in the Agreement." *Id.* ¶ 44.

After Ramus confronted Bulson regarding the "defective work" on the Project and expressed his "dissatisfaction with the status of the Project in general," Bruwer responded by sending "an alarming and hysterical email" to Ramus on January 19, 2023. *Id.* ¶ 67; *see* Am. Compl., Exh. M (1/19/2023 email from Bruwer to Ramus). In that email, Bruwer suggested that

Bulson's business was collapsing and stated that going forward, he would refuse to communicate with Ramus directly.  Am. Compl. ¶¶ 67-68.  Bruwer also indicated that he had "exhausted [his] personal funds to keep things afloat" and could not "pay salaries" or "fund the insurance."  Am. Compl., Exh. M.  Ramus alleges that the January 19 email marked Bulson's "abandoning the Project."  Am. Compl. ¶ 67.

Following Bulson's "abandon[ment]" of the Project, Ramus "discover[ed] that Bulson failed to pay amounts due to [its] subcontractors."  *Id.* ¶¶ 74-75.  Those subcontractors, for their part, claimed that Bruwer had "misrepresented to them that they were not paid pursuant to their respective subcontracts because they were told that [Ramus] was not paying Bulson."  *Id.* ¶ 75.  Specifically, on January 26, 2023, "the HVAC Subcontractor wrote to [Ramus] that Bulson 'said you [(*i.e.*, Ramus)] were not paying them [(*i.e.*, Bulson)], that is why we [(*i.e.*, the HVAC Subcontractor)] pulled off the project so many times.'"  *Id.* ¶ 76 (quoting Am. Compl., Exh. N at 2 (1/26/2023 email from HVAC Subcontractor to Ramus)).  Similarly, on February 2, 2023, the Electrical Subcontractor sent Ramus an email stating:  "They [(*i.e.*, Bulson)] kept telling us [(*i.e.*, the Electrical Subcontractor)] they were not paid by you [(*i.e.*, Ramus)] and therefore they couldn't pay us."  *Id.* ¶ 85 (quoting Am. Compl., Exh. O at 2 (2/2/2023 email from Electrical Subcontractor to Ramus)).  The latter message may have been a reference to a May 23, 2022 email from Metoyer to the Electrical Subcontractor stating that Bulson was "awaiting payment from [Ramus] before [it] can issue a check."  *Id.* ¶ 52 (quoting Am. Compl., Exh. I at Bulson3569-Bulson3570 (5/23/2022 email from Metoyer to Electrical Subcontractor)).

Ramus alleges that Defendants "inflated and misrepresented to [Ramus] the cost of the work of some of the subcontractors in order to keep some or all of the payments for themselves," and also "misrepresented to [Ramus] that they ordered certain supplies, materials, and appliances,

when in fact they had not done so, in order to keep some or all of the payments for themselves." *Id.* ¶¶ 123-124; *see also id.* ¶¶ 74-125 (alleging the factual basis for these diversions).  According to Ramus, "Defendants diverted a total of $538,950.88 of the $972,202.97 [Ramus] paid to Bulson, or 55% of the payments made."  *Id.* ¶ 126 (citing Am. Compl., Exh. R (summary of diverted amounts)).  Rather than using Ramus's "funds as they were designated," Bruwer allegedly "used thousands of dollars in Bulson's bank account to pay his and his wife's income tax debt" of over $180,000.00 in late February and early March 2022, which "coincides with payments made by [Ramus] in early February of over $65,000.00."  *Id.* ¶¶ 71, 141.  Ramus further alleges that while "AFP No. 8 is the clearest evidence of Defendants' misrepresentations regarding the progress of the Project and payments made," *id.* ¶ 60, each AFP misstated certain actual or contemplated expenditures in connection with the Project, *see id.* ¶¶ 48-63.

**B.    Procedural History**

Ramus filed this action against Bruwer and Metoyer on March 1, 2023.  Dkt. 1.  Ramus's original Complaint asserted five causes of action: production of books and records under Article 3-A of the Lien Law, fraud, breach of fiduciary duty, unjust enrichment, and constructive trust. *Id.* ¶¶ 120-156.  Five months later, on August 23, 2023, Ramus commenced an arbitration proceeding against Bulson itself.  Dkt. 49-1.  That proceeding asserted causes of action for fraud, breach of contract, and breach of fiduciary duty, *id.* ¶¶ 99-113, based on factual allegations substantially identical to those presented in Ramus's original Complaint*, id.* ¶¶ 57-98.  But then, on March 6, 2024, Bulson filed for bankruptcy, which automatically stayed the arbitration.  Dkt. 50-1 ¶ 7.  According to Ramus, he was "not identified as a creditor in Bulson's Bankruptcy filings," nor were any of the Project's subcontractors.  Am. Compl. ¶¶ 135-136.

9

On August 29, 2024, Defendants moved to dismiss Ramus's Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, to stay this action pending the outcome of the arbitration against Bulson. Dkts. 48-49. On March 17, 2025, this Court granted Defendants' motion to dismiss in part and denied it in part, and denied their stay request. *Ramus*, 2025 WL 831109, at *15.

As for Ramus's "fraud claim against Bruwer and Metoyer—which [was] based on statements that they made in a representative capacity and which were contractually required to be made in connection with Bulson's course of performance under the Agreement[,]" this Court explained that it was "an impermissible attempt to seek a tort recovery for Bulson's alleged breach of contract." *Id.* at *5-7. That was because Bruwer's and Metoyer's alleged misrepresentations about Bulson's expenditures and fully compensating subcontractors and suppliers "amount[ed] to a breach of the Agreement, which required Bulson to pay its subcontractors, to truthfully represent that it had done so in its AFPs and partial lien waivers, and to provide accurate statements regarding its expenditures." *Id.* at *6 (citing Agreement §§ 4.1, 12.2, 12.4). And for similar reasons, these "alleged misstatements were part and parcel of Bulson's performance under the Agreement, not (as Ramus argue[d]) collateral or extraneous to it." *Id.* at *7. Because Defendants' alleged fraud was "not sufficiently distinct from any alleged breach by Bulson of its contractual obligations under the Agreement," the Court dismissed Ramus's fraud claim. *Id.* The Court likewise "dismisse[d] the unjust enrichment claim as duplicative of Ramus's other causes of action." *Id.* at *12.

Ramus's other claims fared better in light of Defendants' particular challenges to them. The Court "decline[d] to dismiss Ramus's diversion claim" under the Lien Law after considering Defendants' arguments "that Ramus lacks the capacity as a homeowner to bring such a claim under

the Lien Law, can only assert the claim against Bulson itself, or fail[ed] to plead the claim with particularity." *Id.* at *7-12. As this Court explained, Defendants had "present[ed] no other arguments against this claim." *Id.* at *12. Specifically, the Court observed that while they argued that the Lien Law "categorically bars diversion claims against the officers of a trustee"—an argument the Court rejected—they did *not* argue "that the [original] Complaint fail[ed] to adequately allege their knowledge of or involvement in the voluntary diversion of funds held in trust by Bulson." *Id.* at *11. And the Court declined to dismiss Ramus's production-of-books-and-records claim since it rejected Defendants' only argument that such a claim "cannot be asserted against them individually," although the Court deemed the challenge largely "academic because Bulson's books and records will in any event likely be subject to discovery under the Federal Rules of Civil Procedure given the survival of Ramus's claim[] for diversion under the Lien Law." *Id.* at *14-15. As for Ramus's constructive-trust claim, the Court again rejected Defendants' sole attack—"that they did not personally owe [Ramus] a fiduciary duty"—to deny their request to dismiss that claim, but explained that such a "disposition should have little or no practical effect on this case" because "regardless of whether or not the claim survives dismissal, Ramus may, if appropriate, later request, as a remedy, the imposition of a constructive trust." *Id.* at *12-13 (internal quotation marks omitted).

On the question of staying the case pending Bulson's arbitration, this Court noted that while a stay "would normally make sense," it was "unclear when—if ever—the arbitration proceeding against Bulson will be resolved" given "Bulson's ongoing bankruptcy proceeding." *Id.* at *15. As Defendants had "failed to satisfy their burden of showing that a stay of the instant action would serve the ends of judicial efficiency and would not impose an undue hardship on Ramus," the Court denied their stay request "without prejudice to them renewing the request in the future should

11

the circumstances surrounding the arbitration change." *Id.* Finally, the Court ordered the parties to appear at a status conference on April 2, 2025, "to address whether this case must proceed as a representative action on behalf of all remaining beneficiaries to the Article 3-A trust identified in the [original] Complaint and, if so, provide their views as to the appropriate procedural mechanism through which to implement that requirement." *Id.* at \*16.

At that conference, the Court discussed whether Ramus's diversion claim under New York's Lien Law "must proceed on a representative basis and, if so, in what form." Dkt. 62 at 1 (citing April 2, 2025 Minute Entry). After receiving the parties' letter briefs with their positions on that issue, Dkts. 60-61, on May 20, 2025, this Court ordered "Plaintiff to either join all potential beneficiaries to the Article 3-A trust that is the subject of [the diversion claim], or plead class claims and seek class certification pursuant to [Federal Rule of Civil Procedure] 23," Dkt. 62 at 2. "The failure to do so," the Court stated, would "result in dismissal of the [claim] without prejudice." *Id.* The Court further granted Ramus's request to file an amended complaint, allowing Ramus to "replead [his] cause of action for fraud, provided that [Ramus] believes in good faith that he can address the deficiencies identified in the Court's March 17, 2025 Opinion and Order, as well as plead additional causes of action arising out of the parties' dispute if appropriate." *Id.* at 2-3. Ramus was ordered to file the amended complaint by June 20, 2025. *Id.* at 3.

On June 20, 2025, Ramus filed his Amended Complaint. Dkt. 63. The Amended Complaint asserts nine causes of action: (1) diversion of trust assets under Article 3-A of the Lien Law, brought on behalf of a class of which Ramus "is the sole member," *id.* ¶¶ 161-166 ("Count One"); (2) diversion of trust assets under Article 3-A of the Lien Law, brought "on behalf of all beneficiaries of the trust funds created in connection with the Project," *id.* ¶¶ 167-172 ("Count Two"); (3) fraud, *id.* ¶¶ 173-182 ("Count Three"); (4) conversion against Bruwer alone, *id.* ¶¶ 183-

187 ("Count Four"); (5) defamation, *id.* ¶¶ 188-196 ("Count Five"); (6) constructive trust, *id.* ¶¶ 197-203 ("Count Six"); (7) alter ego liability against Bruwer alone, *id.* ¶¶ 204-210 ("Count Seven"); (8) constructive fraud, *id.* ¶¶ 211-220 ("Count Eight"); and (9) production of books and records under Article 3-A of the Lien Law, *id.* ¶¶ 221-229 ("Count Nine"). Ramus's legal claims seek at least $538,950.88 in damages; he further seeks equitable remedies imposing a constructive trust and compelling Defendants to produce books and records. *Id.* at 39-41.

The Court, on July 14, 2025, set a briefing schedule for Defendants' anticipated motion to dismiss. Dkt. 69. Consistent with that schedule, on August 7, 2025, Defendants moved to dismiss the Amended Complaint. Dkts. 70, 71 ("Motion"). Ramus responded on September 8, 2025. Dkt. 72 ("Opposition"). And on September 22, 2025, Defendants replied. Dkt. 73 ("Reply").

## II. Legal Standard

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although a court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

13

### III. Discussion[4]

**A.      Counts One and Two: Diversion of Trust Assets**

As this Court already explained, "[b]ecause Plaintiff's cause of action for diversion of trust assets arises under Article 3-A of the Lien Law, that claim must proceed through a 'representative action brought for the benefit of all beneficiaries of the trust.'" Dkt. 62 at 1 (quoting N.Y. Lien L. § 77(1)). And as this suit is "in federal court, the Federal Rules of Civil Procedure govern the mechanism through which to bring such a representative action." *Id.* So "[t]o avoid dismissal of his Article 3-A claim," Ramus was ordered to amend his Complaint to "either pursue this action as a class action under Rule 23 or join all beneficiaries in the case." *Id.* at 2 (quoting *Tutor Perini Bldg. Corp. v. N.Y.C. Reg'l Ctr., LLC*, 525 F. Supp. 3d 482, 502 (S.D.N.Y. 2021)); *see Quantum Corp. Funding, Inc. v. Bast Hatfield, Inc.*, No. 5:04-CV-137 (FJS/DEP), 2005 WL 1926610, at *7 (N.D.N.Y. June 8, 2005) (explaining that "a party asserting a claim under Article 3-A" may either "satisfy the requirements for a class action that Rule 23 of the Federal Rules of Civil Procedure provides" or "join[] . . . all potential beneficiaries under Rule 19 of the Federal Rules of Civil Procedure").

The Amended Complaint purports to bring Count One on behalf of a "Beneficial Class of Homeowners, Consisting of Plaintiff" as the "sole member." Am. Compl. at 30 & ¶ 164. And "[i]n the alternative," in Count Two, he "asserts this cause of action on [his] own behalf and on behalf of all beneficiaries of the trust funds created in connection with the Project." *Id.* at 30 &

---

[4] As in their briefing for Defendants' prior motion to dismiss the original Complaint, *see Ramus*, 2025 WL 831109, at *5 n.5, the parties do not address choice of law in their briefs, but assume that New York law governs each of Ramus's causes of action. *See generally* Motion; Opposition; Reply. The Court therefore applies New York law in resolving Defendants' motion. *See Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (citation modified)).

¶ 170.  In other words, Ramus has neither pursued this action as a class action under Rule 23 nor joined any beneficiaries under Rule 19.  Ramus argues that his failure to do so is appropriate because "[n]one of the six subcontractors identified" in the Amended Complaint is "listed as creditors of Bulson in its schedule of creditors" filed in Bulson's bankruptcy case.  Opposition at 8-11; *see* Dkt. 72-1 ("Akselrod Decl."), Exhs. A (Bulson's bankruptcy petition), B (amended schedules).  But this argument borders on the disingenuous, because the Amended Complaint itself acknowledges that "*Plaintiff* was not identified as a creditor in Bulson's Bankruptcy filings," either.  Am. Compl. ¶¶ 135-136 (emphasis added); *accord* Akselrod Decl. ¶ 9 ("In [its] bankruptcy petition, which was later amended, Bulson did not name Plaintiff, nor any of the subcontractors working on Plaintiff's renovation project, as creditors.").  Ramus fails to explain why the subcontractors' exclusion from Bulson's bankruptcy filings means that they "do not actually exist" as trust beneficiaries, Opposition at 10, but that his own exclusion should not lead to the same conclusion—especially when his Amended Complaint identifies each of the subcontractors to work on the Project by name and alleges that each was underpaid.  *See* Am. Compl. ¶¶ 17-24 (identifying each subcontractor), 77-100 (recounting each subcontractor's underpayment).

The "requirement of a representative action is integral to Article 3-A's general purpose," which is to "safeguard[] an equitable *pro rata* distribution of the funds to all suppliers of material and labor who have improved the real property."  *Quantum Corp. Funding*, 2005 WL 1926610, at *6 (internal quotation marks omitted).  This requirement, then, is no mere procedural formality: Article 3-A claims "may not be enforced by an individual creditor in that class, for his own individual benefit, since he may not thus gain a preference as against others in his class."  *In re Indus. Laundry Mach. Co.*, 161 N.Y.S.2d 547, 548 (2d Dep't 1957); *accord Tutor Perini Bldg.*, 525 F. Supp. 3d at 501.  As Ramus points out, it may well be the case that "where the plaintiff is

15

the only apparent claimant to diverted funds, the plaintiff can pursue an Article 3-A claim on its own behalf as a 'class' of one." Opposition at 10; *see, e.g.*, *Syro Steel Co. v. Mellon Bank (E.) P.S.F.S. Nat'l Ass'n*, No. 90-CV-1321, 1993 WL 173439, at *2 (N.D.N.Y. May 17, 1993) ("If plaintiff could demonstrate that it is the only beneficiary then it could proceed."). But Ramus's own pleadings indicate that is not the case here.

For this reason, Ramus's reliance on cases distinguishing between the pleadings stage and the class-certification stage fall short. *See* Opposition at 11-13. Those cases did not involve claims that were admittedly "brought initially and principally solely on behalf of Plaintiff himself," *id.* at 10. *See Tutor Perini Bldg.*, 525 F. Supp. 3d at 503-04 (declining to dismiss a claim brought principally "in a representative fashion, for the benefit of all beneficiaries who might have an interest [in] this litigation" because the case was "at the pleading stage" without "a motion for class certification under review"). And Plaintiff's alternative claim brought "on behalf of all beneficiaries of the trust funds created in connection with the Project," Am. Compl. ¶ 170, does not excuse his failure to join those beneficiaries, who were identified in the Amended Complaint, *id.* ¶¶ 17-24. Defendants point out that this failure may be to avoid "destroy[ing] diversity jurisdiction." Reply at 6;[5] *accord* Motion at 8. But if the subcontractors "cannot be joined here in federal court because they will destroy diversity jurisdiction, then the [claim] simply cannot proceed here." *Syro Steel*, 1993 WL 173439, at *2; *accord U.S. Fidelity & Guar. Co. v. Madison Fin. Corp.*, No. 01 Civ. 3008 (CM), 2002 WL 31731020, at *8 (S.D.N.Y. Dec. 4, 2002). A representative action could come at the cost of Ramus's recovery or diversity jurisdiction, but neither cost calls for disregarding the Lien Law's representative-action requirement.

---

[5] Defendants' reply brief lacks page numbers, so citations to that filing are to the ECF-generated page numbers.

Since Ramus "has presented no cases that even suggest that the representative capacity requirement can be waived, or that an individual plaintiff may proceed to recover only its share of the trust," this suit "must proceed in a representative capacity to protect the interests of the other potential trust fund beneficiaries." *Syro Steel*, 1993 WL 173439, at *2. And "[b]ecause the action is not a representative action as required by the New York Lien Law"—despite Ramus being given the opportunity to amend his Complaint to bring this action as such, *see* Dkt. 62—his diversion of trust assets claims are "dismissed without prejudice." *Syro Steel*, 1993 WL 173439, at *2; *accord Iberia Roads Markings Corp. v. Freire*, No. 19 Civ. 3410 (SJB), 2024 WL 4145227, at *6-7 (E.D.N.Y. Mar. 29, 2024); *Glazer v. Alison Homes Corp.*, 309 N.Y.S.2d 381, 382, 385 (Sup. Ct. Kings Cnty. 1970).

**B.      Counts Three and Eight: Fraud and Constructive Fraud**

Ramus asserts that his claims for fraud and constructive fraud in the Amended Complaint survive, Opposition at 13-21, but fails to explain why those claims are meaningfully different from the one this Court previously dismissed. To state a claim for fraud under New York law, the plaintiff "must allege: (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [the plaintiff]; and (iv) resulting damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011). "Constructive fraud requires establishing the same elements as actual fraud, except that the element of *scienter* is replaced by a fiduciary or confidential relationship between the parties." *Tutor Perini Bldg.*, 525 F. Supp. 3d at 515 (citation omitted). "In addition, the plaintiff must allege specific facts as to the fraud, including the misleading statements, speaker, time, place, individuals involved, and specific conduct at issue." *Johnson*, 660 F.3d at 143 (citing Fed. R. Civ. P. 9(b)). And it is well-settled that "a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir.

17

2006) (internal quotation marks omitted).  So "courts applying New York law routinely hold that representations by a non-party made on behalf of the contracting party may be duplicative of the contract claim against the contracting party." *Ramus*, 2025 WL 831109, at *5 (citation modified).

Based on these principles, this Court initially dismissed Ramus's fraud claim "premised on alleged misstatements in AFP No. 8 and the Partial Lien Waiver concerning Bulson's expenses and whether it was complying with its contractual obligation to pay its subcontractors and suppliers under the Agreement" because such a claim "against Bruwer and Metoyer" was "an impermissible attempt to seek a tort recovery for Bulson's alleged breach of contract." *Id.* at *5-6.  In reaching that conclusion, the Court first explained that because "the only statements that Ramus plead[ed] with particularity and substantively addresse[d] in his briefing [were] those contained in AFP No. 8 and the Partial Lien Waiver," it would "not consider additional statements and theories of fraud that Ramus either failed to plead with particularity or did not substantively defend in his briefing." *Id.* at *5 n.4.  And the statements this Court did consider—in which "Bruwer and Metoyer represented that Bulson had complied with its obligation to fully compensate its subcontractors and suppliers" and invoiced certain expenditures—"amount[ed] to a breach of the Agreement, which required Bulson to pay its subcontractors, to truthfully represent that it had done so in its AFPs and partial lien waivers, and to provide accurate statements regarding its expenditures." *Id.* at *6 (citing Agreement §§ 4.1, 12.2, 12.4).  So Ramus's fraud claim against Defendants arose "from the same allegations and would necessarily require the same proof as a breach of contract claim against Bulson." *Id.* (internal quotation marks omitted).  Similarly, those "alleged misstatements were part and parcel of Bulson's performance under the Agreement, not (as Ramus argue[d]) collateral or extraneous to it." *Id.* at *7.  "[F]ar from being collateral or extraneous to the Agreement, Bruwer's execution of AFP No. 8 in his capacity as Bulson's CEO and Metoyer's

18

signing of the Partial Lien Waiver as Bulson's Comptroller, and the obligation under the Agreement that these documents contain accurate information as to Bulson's expenses and payments to its subcontractors, were the 'very essence' of Bulson's performance of its contractual obligations." *Id.* (collecting cases). As "Bruwer and Metoyer's alleged fraud [was] not sufficiently distinct from any alleged breach by Bulson of its contractual obligations under the Agreement," this Court thus "dismisse[d] the fraud claim." *Id.*

As before, the parties dispute which—if any—of Defendants' allegedly fraudulent statements in the Amended Complaint are pleaded with particularity. *Compare* Reply at 10-11 ("Plaintiff still does not pinpoint which particular statements were false in each instance."), *and* Motion at 12-13 (similar), *with* Opposition at 13-14 ("The [Amended Complaint] painstakingly recounts the statements made by each Defendant, and includes their subjects, when they were made, to whom they were made, and how they were made."). Ramus insists that this Court "already ruled that the original Complaint . . . satisfied the specificity requirements of . . . Rule 9(b)." Opposition at 1, 13. But this Court could not have been clearer that "the only statements that Ramus plead[ed] with particularity and substantively addresse[d] in his briefing [were] those contained in AFP No. 8 and the Partial Lien Waiver," statements that could not form the basis of a viable fraud claim. *Ramus*, 2025 WL 831109, at *5 n.4 & *5-7; *see also id.* at *12 n.11 ("[T]he claim complies with Rule 9(b) to the extent that it is based on alleged misstatements contained in AFP No. 8 and the Partial Lien Waiver concerning Bulson's payments to its subcontractors and suppliers and its expenditures."). And while Ramus asserts that the Amended Complaint "greatly expands on the details of Defendants' fraud," Opposition at 13, he mistakes quantity for quality: most of his arguments merely rehash those already rejected by this Court. *Compare id.* at 14 ("The fraud claims, both general and constructive, against Defendants cannot be duplicative of a breach

19

of contract claim because Defendants are not parties to any contract with Plaintiff and thus no contract claim is, or could be, asserted against them."), *with Ramus*, 2025 WL 831109, at *5-6 ("In this case, Ramus's fraud claim against Bruwer and Metoyer—which is based on statements that they made in a representative capacity and which were contractually required to be made in connection with Bulson's course of performance under the Agreement—is an impermissible attempt to seek a tort recovery for Bulson's alleged breach of contract."), *and* Opposition at 16 ("Misrepresentations made after a contract is entered into which relate to a present fact that would exist if the contract were performed, are collateral or extraneous to the contract and are actionable in fraud." (citation modified)), *with Ramus*, 2025 WL 831109, at *7 ("Bruwer and Metoyer's alleged misstatements were part and parcel of Bulson's performance under the Agreement, not (as Ramus argues) collateral or extraneous to it."). Ramus makes no effort to explain why this Court was wrong the first time.

The only difference between then and now is that there is no longer a "pending contract claim" against Bulson in arbitration because Ramus has "discontinued the Arbitration after Bulson's Bankruptcy was administered." Opposition at 14-15 (citing Akselrod Decl. ¶ 13); *see* Akselrod Decl., Exh. E (withdrawing Ramus's claim in arbitration "without prejudice"). Given that discontinuance, Ramus asserts that "even if Defendants ever had a valid argument grounded in duplicative parallel contract claims, it is now moot." Opposition at 15. But he cites no caselaw for this proposition. Indeed, the Court already concluded that Ramus's fraud claim against Defendants was duplicative of any contract claim against Bulson even though it was "unclear when—*if ever*—the arbitration proceeding against Bulson w[ould] be resolved." *Ramus*, 2025 WL 831109, at *15 (emphasis added). And it would be passing strange for a fraud claim to be viable "against the individual who represented the corporation" simply because it was brought

before a plaintiff "sue[d] the corporation (who was a party to the contract) for breach of contract." *Lefkowitz v. Reissman*, No. 12 Civ. 8703 (RA), 2014 WL 925410, at \*5 n.1 (S.D.N.Y. Mar. 7, 2014). So the Court declines to adopt Plaintiff's proposed rule—again, without cited support— that there must be a "pending contract claim" to dismiss an otherwise duplicative fraud claim. Opposition at 14-15; *cf. Maricultura Del Norte v. World Bus. Cap., Inc.*, 159 F. Supp. 3d 368, 377-78 (S.D.N.Y. 2015) ("It is well settled under New York law that a party cannot maintain overlapping fraud and breach of contract claims regardless of whether the alleged contract is unenforceable." (citation modified)).

Aside from the kinds of statements this Court already rejected, the only other allegedly false statement that Ramus substantively addresses in his briefing is that "Defendants also concealed Bulson's deteriorating financial condition from Plaintiff, which would prevent Bulson from finishing the Project, but induced Plaintiff to pay Bulson's applications for payments as they were issued," Am. Compl. ¶ 176. *See* Opposition at 19-21 (explaining that this "theory" of fraud was "not set forth in the [original Complaint]"). Ramus is right that a "party's misrepresentations regarding its ability and resources to perform a contract are independent of the contract and may form the basis of a viable fraud claim." *Id.* at 19 (internal quotation marks omitted) (collecting cases). But Ramus elides a key distinction between "false statements about a party's present financial condition or current ability to perform*, made in order to induce a party to enter into a contract*," which remain actionable in fraud, and those "made *after*" the formation of a contract, which—"because they amount to mere false assurances of [the contracting party's] intent to perform"—are not. *Wild Bunch, SA v. Vendian Entm't, LLC*, 256 F. Supp. 3d 497, 506-07 (S.D.N.Y. 2017) (first emphasis added); *accord SAT Aero Holdings, Inc. v. Aerolinea del Estado Mexicano, S.A. de C.V.*, No. 24 Civ. 2300 (VM), 2025 WL 3012989, at \*3-5 (S.D.N.Y. Oct. 28,

21

2025); *Mohegan Lake Motors, Inc. v. Maoli*, No. 16 Civ. 6717 (NSR), 2017 WL 6335905, at \*7-8 (S.D.N.Y. Dec. 7, 2017).  Any alleged misrepresentations about Bulson's financial condition—assuming without deciding that they are pleaded with particularity—are of the latter kind, and thus fall short as a matter of law.  *Compare* Am. Compl. ¶ 176 (claiming that Defendants' concealment "induced Plaintiff to pay Bulson's applications for payments as they were issued"), *with* Reply at 9 (distinguishing between actionable "fraudulent inducement by misrepresenting a company's financial condition to secure a contract" with the present allegations "that Defendants lied in order to keep Plaintiff paying under the contract and to conceal Bulson's breaches").[6]  So Ramus's fraud and constructive fraud claims are dismissed with prejudice.

## C.    Count Four: Conversion

Ramus likewise fails to state a conversion claim against Bruwer.  Under New York law, a "conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession.  Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006) (citations omitted).  "[I]t is well settled, at least under New York law, that an action will lie for the

---

[6] In his brief, Ramus points to a purportedly judicially noticeable source indicating "that Bulson was already in that catastrophic financial position even *before* it entered into a contract with Plaintiff on August 6, 2020."  Opposition at 20 (citing Akselrod Decl., Exh. F at 7:19-8:16 (9/23/2019 Deposition of Bruwer)).  But the Amended Complaint alleges no misrepresentations made in the leadup to the August 6, 2020 date on which Ramus and Bulson entered into the Agreement, *see* Am. Compl. ¶ 8, let alone with any particularity, *see Olson v. MLB*, 29 F.4th 59, 71 (2d Cir. 2022) ("Under Rule 9(b)'s particularity requirement, the plaintiff must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." (citation modified)).

conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Bascuñán v. Elsaca*, 874 F.3d 806, 820 n.56 (2d Cir. 2017) (internal quotation marks omitted). "[W]hen the funds at issue in an action for the conversion of money constitute a specific sum, one that is determinate and reflects an ascertained amount, the money is specifically identifiable," "even though the specific bills are not identified." *Family Health Mgmt., LLC v. Rohan Devs., LLC*, 171 N.Y.S.3d 44, 50, 52 (1st Dep't 2022) (internal quotation marks omitted). And although a conversion claim "under New York law cannot be predicated on a mere breach of contract," *Rynasko v. NYU*, 63 F.4th 186, 196 (2d Cir. 2023) (internal quotation marks omitted), "a conversion claim is not duplicative of a contract claim where a plaintiff alleges acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights," *Tutor Perini Bldg.*, 525 F. Supp. 3d at 515 (internal quotation marks omitted).

The Court agrees with Defendants that Ramus's conversion claim against Bruwer fails. As an initial matter, the conversion claim is not duplicative of any breach of contract claim against Bulson because the Amended Complaint alleges that Bruwer "took the separate, additional step of arranging for the Funds to be directed into [his] possession," which would be a "wrongful act[]" in its own right. *Id.* (internal quotation marks omitted); *see* Am. Compl. ¶¶ 140-143. But that leads to a separate problem: Ramus does not plead a determinate, ascertained amount that Bruwer converted. Rather, Ramus claims that "[a]s a result of Defendant Bruwer's conversion," he "has suffered . . . substantial damages in an amount to be determined at trial, but not less than $538,950.88." Am. Compl. ¶ 187. Courts have held similar allegations to fall short of "specifically identifying the funds in question." *In re JMK Constr. Grp., Ltd.*, 502 B.R. 396, 414 (S.D.N.Y. 2013) (holding that an allegation "seek[ing] damages for conversion 'in an amount not

23

less than $423,963.21'" was insufficient); *In re Brizinova*, 554 B.R. 64, 85-86 (E.D.N.Y. 2016) (holding that an allegation seeking "Proceeds in an amount to be determined at trial, currently estimated to be not less than $250,000" was insufficient (citation modified)).  And even if, as Ramus argues, "the specific funds converted are the funds diverted from the Project, in the exact amount of $538,950.88, which were to be held in trust," Opposition at 21-22, that is the amount "*Defendants diverted*" of the total "$972,202.97 Plaintiff paid to Bulson," Am. Compl. ¶ 126 (emphasis added), which does not correspond with Ramus's money that Bruwer allegedly converted into his personal possession.  *See id.* ¶ 141 ("In late February and early March 2022, Bruwer paid his and his wife's personal income tax debt via Bulson's bank account, in an amount exceeding $180,000,00 . . . .  This coincides with payments made by Plaintiff in early February of over $65,000.").[7]  Absent an allegation of specifically identifiable funds that Bruwer converted, Ramus's conversion claim fails.  *See Rynasko*, 63 F.4th at 196.  So the Court dismisses this claim, too, with prejudice.

**D.    Count Five: Defamation**

Ramus also fails to plead a claim of defamation against Defendants.  "Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or *per se* actionability."  *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).  Because "federal courts sitting in diversity apply state substantive law and

---

[7] Indeed, the Court observes that if Ramus's common law conversion claim was based on the $538,950.88 alleged to be diverted trust assets in violation of New York's Lien Law, such a claim could be an impermissible end-run around the Lien Law's representative-action requirement. *See supra* III.A; *cf. Ramus*, 2025 WL 831109, at *11 (explaining that some courts "have justified imposing the duty [not to divert trust asserts] by way of reference to the law of conversion").  The parties have not discussed this issue, so the Court need not address it further.

federal procedural law," a "plaintiff's defamation claims are subject to the liberal pleading standards of [Federal Rule of Civil Procedure] 8, rather than the particularized pleading requirements set forth in New York's C.P.L.R. section 3016." *Neal v. Asta Funding, Inc.*, No. 13 Civ. 2176 (VB), 2014 WL 3887760, at *3 (S.D.N.Y. June 17, 2014) (citation modified). *Contra* Reply at 13 (arguing that Ramus's defamation claim "fails under CPLR 3016(a)"); Motion at 15-16 (similar). But "[e]ven under the more lenient federal standard," the plaintiff "must at least identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published." *Neal*, 2014 WL 3887760, at *3 (internal quotation marks omitted). That is, "a complaint alleging defamation is sufficient if it adequately identifies the purported communication and provides an indication of who made the communication, when it was made, and to whom it was communicated." *Sebastiani v. Brooklyn Hosp. Ctr.*, No. 19 Civ. 253 (PKC), 2019 WL 3281010, at *4 (E.D.N.Y. July 19, 2019) (citation modified).

Ramus points to two allegedly defamatory statements: one relayed by the HVAC Subcontractor on January 26, 2023 that "Bolson [sic] management said you [(*i.e.*, Ramus)] were not paying them," Am. Compl., Exh. N at 2, and the other relayed by the Electrical Subcontractor on February 2, 2023 that "They [(*i.e.*, Bulson)] kept telling us they were not paid by you [(*i.e.*, Ramus)] and therefore they couldn't pay us," Am. Compl., Exh. O at 2. *See* Am. Compl. ¶¶ 191-192. But the "Amended Complaint . . . does not state who at [Bulson] made the alleged statements, nor does it state when the statements were made. The Amended Complaint thus lacks the requisite specificity." *Rodgers-King v. Candy Dig. Inc.*, No. 23 Civ. 2591 (RA), 2024 WL 382092, at *8 (S.D.N.Y. Feb. 1, 2024); *see also Neal*, 2014 WL 3887760, at *3 (collecting cases dismissing defamation claims that "fail[] to identify" which member of an organization was "responsible for

25

making the statement"). Indeed, the Amended Complaint alleges only that "Defendants' false statements to the subcontractors were in written form, sent by e-mail." Am. Compl. ¶ 190. Such a "claim for defamation against all defendants, lumped together, is pleaded in so vague and conclusory a fashion as to fail to satisfy even the lenient notice pleading requirements of Rule 8(a)." *Rafferty v. Halprin*, No. 90 Civ. 2751 (CSH), 1991 WL 148798, at *8 (S.D.N.Y. July 26, 1991). After all, based on the allegations in the Amended Complaint, it is unclear whether Bruwer or Metoyer even made these statements. *Cf. Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)). So the Court dismisses with prejudice Ramus's defamation claim based on those statements.[8]

### E.   Count Seven: Alter Ego Liability Against Bruwer

Ramus's purported claim of alter ego liability against Bruwer can be swiftly dismissed. "Piercing the corporate veil"—also known as "an alter ego theory"—"generally is not itself an action, but is merely a procedural means of allowing liability on a substantive claim, and without

---

[8] In his papers, Ramus points to a May 23, 2022 email from Metoyer to the Electrical Subcontractor in which Metoyer stated: "We are awaiting payment from the Client before we can issue a check." Opposition at 22 (quoting Am. Compl. ¶¶ 52-53; Am. Compl., Exh. I at Bulson3569-Bulson3570). But Ramus does not assert that this email is the allegedly defamatory statement; instead, he suggests that this email was what the Electrical Subcontractor was referring to in *its* "e-mail to Plaintiff that forms the basis of the defamation claim." *Id.* This may be because the "statements that the [Amended Complaint] alleges are defamatory"—namely statements relayed by the HVAC and Electrical Subcontractors—"appeared verbatim in the [original Complaint]," such that a defamation claim based on those statements would relate back to the original Complaint. *Id.* at 22-23 (citing Dkt. 1 ¶¶ 67, 77). Metoyer's email, by contrast, did not appear in the original Complaint, and would otherwise be time barred under New York's one-year statute of limitations for defamation claims, *see* N.Y. C.P.L.R. § 215(3), because it does not relate back to the original Complaint, *see* Fed. R. Civ. P. 15(c)(1)(B). *See Cojocaru v. CUNY*, No. 19 Civ. 5428 (AKH), 2020 WL 5768723, at *4 (S.D.N.Y. Sept. 28, 2020) ("Courts in this district have held that defamation claims do not relate back to a prior pleading where they allege new instances of defamation." (citation modified)). The Court thus does not consider a defamation claim based on Metoyer's May 23, 2022 email.

an underlying cause of action creating corporate liability, evidence of an abuse of the corporate form is immaterial." 18 C.J.S. Corporations § 38 (Mar. 2026). In other words, "[a] veil-piercing claim is a means of imposing liability on an underlying cause of action and cannot stand as an independent claim." *Ocampo v. Brown & Appel, LLC*, No. 21-2579-cv, 2022 WL 17684587, at *2 (2d Cir. Dec. 15, 2022) (summary order) (citation modified); *accord DiMauro v. United, LLC*, 996 N.Y.S.2d 297, 298 (2d Dep't 2014) ("New York does not recognize a separate cause of action to pierce the corporate veil."). Because Ramus does not plead an underlying cause of action against Bulson, the corporation, the Court dismisses with prejudice his alter-ego claim against Bruwer. *See, e.g.*, *Ocampo v. 455 Hosp. LLC*, No. 14 Civ. 9614 (KMK), 2021 WL 4267388, at *10 (S.D.N.Y. Sept. 20, 2021) ("Courts in the Second Circuit routinely dismiss independent causes of action separately alleging alter ego or veil piercing liability."), *aff'd*, 2022 WL 17684587 (2d Cir. Dec. 15, 2022).

### F.    Counts Six and Nine: Constructive Trust and Production of Books and Records

With all other claims dismissed, that leaves Ramus's purported claims for constructive trust and the production of books and records. This Court previously denied Defendants' request to dismiss those claims, but acknowledged that such a "disposition should have little or no practical effect on this case" because a constructive trust could later be requested "as a remedy" and "Bulson's books and records will in any event likely be subject to discovery under the Federal Rules of Civil Procedure given the survival of Ramus's claim[] for diversion under the Lien Law." *Ramus*, 2025 WL 831109, at *13-15 (internal quotation marks omitted). In their motion to dismiss the Amended Complaint, Defendants assert that they "have not moved against" these claims, but also argue why both claims "should be dismissed." Motion at 18-19. *Compare id.* at 2 ("Defendants move to dismiss all causes of action in the [Amended Complaint] except the Sixth

27

Cause of Action (Constructive Trust) and the Ninth Cause of Action (Books and Records), which Defendants do not challenge again here."), *with id.* at 1 ("Defendants Graham Bruwer and Gerard Metoyer respectfully submit this Memorandum of Law in support of their motion to dismiss the . . . Amended Complaint in its entirety."). Understandably confused by this mixed messaging, Ramus only "briefly addresses Defendants' argument as to those claims." Opposition at 25-26 & n.3. This Court will accordingly not fault Ramus for "offer[ing] little defense" of these claims "beyond asserting that the Court previously allowed [them] to proceed." *Contra* Reply at 13-14.

Whether Ramus can bring standalone causes of action for constructive trust and the production of books and records absent any other live claims is a difficult question. *See Ramus*, 2025 WL 831109, at *13 ("[I]t is not exactly clear whether a request for a constructive trust can stand as a distinct cause of action at all."); *id.* at *14 (acknowledging that "[w]hether such an order" for Defendants to produce Bulson's books and records "would ultimately be feasible and justified . . . is a question that the Court does not resolve at this stage"). The Court will not dismiss those claims on that ground without giving Ramus a fair opportunity to brief the question. So the parties are ordered to provide supplemental briefs with their views on the matter.[9]

### IV. Conclusion

For the above reasons, the Court grants Defendants' motion to dismiss the Amended Complaint as to Counts One, Two, Three, Four, Five, Seven, and Eight. Ramus's diversion-of-trust-assets claims—Counts One and Two—are dismissed without prejudice; the others are dismissed with prejudice. Because Ramus has not requested leave to amend or explained how he would seek to cure the deficiencies in those Counts, the Court does not *sua sponte* grant leave to

---

[9] Should Ramus not wish to proceed on those claims alone, he shall notify the Court in lieu of a supplemental brief.

amend.  *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [for leave to amend] that was not made.").

As for Counts Six (Constructive Trust) and Nine (Production of Books and Records), the parties shall submit a proposed supplemental briefing schedule as to whether such claims are independently viable absent any other causes of action by April 6, 2026.

The Clerk of Court is respectfully directed to close Docket Number 70.

SO ORDERED.

Dated: March 30, 2026
New York, New York

_____
JOHN P. CRONAN
United States District Judge